**ANTHONY M. MEYERSTEIN, Inc.**

v.

**The UNITED STATES.**

No. 49531.

United States Court of Claims.
Jan. 31, 1956.

M. Carl Levine, New York City, for plaintiff. Morgulas & Foreman were on the brief.

Bruce G. Sundlun, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant. John F. Wolf, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

Plaintiff claims damages arising out of alleged breaches by defendant of a lump sum equipment contract. This contract called for the design and construction by plaintiff, according to defendant's specifications, of two 125-ton ocean-going cranes.

Plaintiff contends that it was misled by the plans and specifications furnished by defendant as to the quantity of steel it would have to furnish to construct the cranes. It also contends that defendant required "illegal changes" in the contract which it claims also resulted in an overrun of steel used.

This case arises out of a Navy Department contract for the construction of two 125-ton floating cranes.

Each crane was to be constructed so as to incorporate ocean-going characteristics and the ability to replace 16-inch gun barrels on battleships operating against the enemy in remote areas of the Pacific.

The Bureau of Yards and Docks of the Navy Department was designated to administer the "125 ton floating crane project" including the preparation of invitations to bid.

Plaintiff was invited to bid on this so-called 125-ton floating crane project by an invitation to bid dated August 23, 1943. It was required that the bids in response thereto reach the Bureau by October 1, 1943. Accompanying the in-

vitation to bid were the specifications and two schematic or outline drawings of the cranes and pontoons to be constructed. On one of the outline drawings there appeared a table entitled "Crane Data" which purported to show "estimated" and "approximate" weights of the component parts of the crane. Aside from the weights and counterweights and ballast, the table showed the total estimated weight of the crane to be 1,-222,000 pounds, and of the pontoon to be 2,180,000 pounds.

By letter dated October 8, 1943, the plaintiff submitted its bid and offered to do the work, complete in accordance with the specifications and outline drawings accompanying the invitation to bid, at a price of $1,158,600. The plaintiff's bid further stated in pertinent part as follows:

"We are attaching with our bid duplicate copies of our drawings Nos. W-1, W-2, W-3, W-4, W-5 and W-6, illustrating assembly drawings of the crane, barge and stability calculations and weights of the different parts involved.

"We believe that we can make delivery of the first floating crane complete in eight months and the second two months thereafter * * *."

Plaintiff, by drawing No. W-5 accompanying the bid, purported to show the total weight of the proposed crane superstructure together with the rotating platform to be 1,200,054 pounds, exclusive of the counterweights.

In fact, however, the "W" drawings, even though drawn to scale, did not state the sizes and weights of the various members in the parts and sections of the crane. As shown on their faces they were drawings of the "general" assembly. The stability calculations in W-5 drawings concerned large segments and sections of the crane, and did not purport to cover the specification stresses on individual parts which would be determinative of weight.

By letter dated October 15, 1943, the Navy Department accepted the plaintiff's bid, assigned contract numbered NOy-6303, gave notice to proceed and further stated in pertinent part as follows:

"* * * The cranes shall be delivered, one on June 15, 1944 and one on August 15, 1944. The formal contract shall be executed on the Bureau's standard form of lump sum equipment contract with such modifications therein as the Chief of this Bureau may determine proper under the particular circumstances, including the standard termination provisions which are also applicable to this notice of acceptance and your right to proceed thereunder * *."

The plaintiff and the defendant thereafter entered into a formal written contract, antedated October 18, 1943, but executed by the plaintiff on January 12, 1944, and by the Navy Department on January 19, 1944. The contract named the Chief, Bureau of Yards and Docks, as the contracting officer, and further provided in pertinent part as follows:

"Article 1. (a) Subject matter of purchase.—The Contractor shall furnish and deliver f. o. b. contractor's plant two floating cranes as called for by specification No. 11264 * * *."

Specification No. 11264 was the same specification that accompanied the invitation to bid.

By letter dated March 30, 1944, the Navy Department terminated the provisions of the contract for fabrication and shop assembly of the two pontoons. Under date of July 29, 1946, the Chief, Bureau of Yards and Docks, issued a change order, accepted by the plaintiff on August 6, 1946, which allowed an increase in the contract price of $21,944.12 on account of an increase in the width of the pontoons, a reduction of $80,700 because of termination of fabrication and shop assembly of pontoons and various minor increases and decreases which resulted in a net decrease in the contract price of $59,992.61.

The plaintiff completed the fabrication of the two cranes in the latter part

of July 1945, and they were accepted by the Navy Department.

When completed, each of the crane superstructures with rotating platforms weighed (exclusive of counterweights) 1,678,783 pounds.

Mr. Meyerstein, president of the plaintiff company, long before and during the contract period in question, understood that the Navy had not developed detailed designs and plans for constructing the cranes, and that the company awarded the contract would have to develop its own design to meet the Navy specifications. Paragraph 1–12 of the specifications accompanying the invitation to bid clearly showed that the design of the cranes was to be performed by the successful bidder. The design requirements for the crane boom and rotating platform, as stated in paragraph 4–01 of the specifications, imposed three conditions, namely, (1) operational requirements, (2) crane roll stress due to 1/20 trochoid wave with boom extended, and (3) stresses due to wind action. There was ample information contained in the specifications and Navy drawings to enable the plaintiff to prepare a bid, and the time allowed for preparation and submission thereof was reasonable and sufficient. No language regarding overrun of weight was requested by plaintiff or included in the contract although plaintiff was aware of this possible eventuality. Plaintiff carefully reviewed the proposed contract. The Navy specification drawings upon which plaintiff claims to have relied in arriving at its bid price were merely outline sketches which would not permit the calculation of stresses, sizes and exact weights of the various members of the cranes and, furthermore, plaintiff should have realized that it could not reasonably reply on the weight estimates contained in the specification drawings prepared by defendant.

The specifications used in the invitation to bid were the same as the specifications incorporated into the executed contract. Plaintiff's "W" drawings, submitted with its bid proposal were never considered to be a part of the contract. In compliance with specification 1–12 plaintiff prepared and submitted to defendant detailed design drawings. Defendant's representatives never undertook to change the basic design proposed by the plaintiff, but directed corrections thereof to meet specification requirements. However, defendant did point out to plaintiff's chief engineer during design stages that there was an excessive use of diaphragms between the sides of the boom, but no changes were made by the plaintiff in this respect in the design resubmissions.

Plaintiff's first contention is that defendant's request for bids on the 125-ton floating crane project dated August 23, 1943, was misleading and amounted to a misrepresentation of defendant as to the weight of steel required for the construction of the floating cranes. Plaintiff asserts that although it acted with due care in relying on said misrepresentations, it suffered damage. Plaintiff also argues in its brief that the drawings accompanying the invitation to bid were incorrect with respect to the calculation of freeboard and that this alleged error was an important misrepresentation. In support of the latter contention plaintiff cites the cases of Montrose Contracting Co., Inc., v. County of Westchester, 2 Cir., 80 F.2d 841; United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166; City of New York v. Pennsylvania Steel Co., 2 Cir., 206 F. 454.

In each of the above cases there were definite plans and specifications amounting to representation of facts about which the defendant knew. Failure of the defendant to properly disclose the conditions under which the plaintiff was required to work, reasonably relied on by the contractors involved, directly lead to the loss sought to be recovered. This is not the situation in the instant case. Plaintiff here discovered the alleged error in the calculations of the freeboard prior to the submission of its bid, but did not notify the Navy and did not state any

exceptions in its bid on account of it. This all notwithstanding paragraph 4 of the instructions to bidders which requested that errors "noted by intending bidders should be promptly reported to the office from which the bidding information was obtained for correction or interpretation before the date of the opening of bids."

As to alleged misrepresentation by defendant regarding the weights of steel required, the only reference made to weight by the defendant was on an outline drawing numbered 271987 which accompanied the invitation to bid and the specifications. This drawing contained a subheading as follows: "All weights and CG's are estimated and are approximate only." In addition, the drawings upon which plaintiff claims to have relied were merely outline sketches which gave only the reaches of the cranes and dimensions of the pontoons. Certainly, under these circumstances, plaintiff could not have reasonably relied on the weight estimates shown therein. The evidence further shows that any competent engineer reviewing the Navy specifications and drawings would have realized that the Navy drawings were only a general idea of a crane, that the successful bidder would be required to develop a complete set of designs which would conform to the specifications, and that the weights estimated by the defendant could not reasonably be relied upon in computing the bid.

Further, Mr. Meyerstein, prior to the time his company bid on the floating crane contract, understood that the Navy had not developed detailed designs and plans for constructing the cranes, and that the company awarded the contract would have to develop its own design to meet the Navy specifications. Paragraph 1–12 of the specifications also provided: "Before commencing the fabrication of any of this work, the contractor shall submit for approval drawings and calculations * * *."

Plaintiff was aware of the fact that weight of the cranes would depend upon design and specifications. Plaintiff was also aware of the fact that, under the terms of the specifications it was to compute the weight of all materials to be used. In fact, what the Navy wanted was a crane which could be used under certain conditions and if it were so designed and built, weight was not an important factor. The design requirements for the crane's superstructure and rotating platform imposed three conditions; i. e., operational requirements, crane roll stress caused by a $\frac{1}{20}$ trochoid wave with boom extended, and stress due to wind action. There was ample information contained in the specifications and Navy drawings to enable plaintiff to prepare a bid, and the time allowed for preparation and submission thereof was reasonable and sufficient.

The rule is that where the aggrieved party knows the actual state of affairs, representations contrary to the fact cannot be construed as warranties. DuBois Construction Corporation v. United States, 98 F.Supp. 590, 120 Ct.Cl. 139, 169 and cases cited therein.

Therefore, it is apparent that there is no merit in plaintiff's claim on account of misrepresentation by defendant.

■■ Plaintiff's second contention is that in fabricating each crane it was necessary to use 478,729 pounds of steel in excess of that required by the terms of the contract, because of illegal changes defendant made in the contract, for which plaintiff should be compensated.

As to this contention plaintiff says the "W" drawings submitted with its bid proposal stated it was plaintiff's considered opinion that each crane's superstructure and rotating platform would weigh 1,200,054 pounds exclusive of counterweights; that when completed, each crane's superstructure and rotating platform would weigh (exclusive of counterweights) 1,678,783 pounds, or 478,729 pounds per crane more than the weights shown on plaintiff's W–5 tables which were submitted with its bid. It is the cost of this alleged overrun of

weight which plaintiff seeks to recover in this suit.

The short answer to this contention is: Neither party intended that "W" drawings were to be a part of the contract, binding them as to the weights stated therein. The "W" drawings were described by plaintiff in its claim letter of February 25, 1946, as "preliminary drawings." They were not detailed design drawings from which a crane could be built and showed only some of the individual members of the crane's superstructure and none of the stresses on any of them. The provisions of the formal contract, not the preliminary drawings, governed the obligation of the parties. Union Paving Company v. United States, 115 F.Supp. 179, 126 Ct.Cl. 478, 489; Callahan Construction Co. v. United States, 47 Ct.Cl. 177.

Defendant was to approve the plaintiff's design before fabrication began, pursuant to paragraph 1–12 of the specifications. In this connection the Navy never undertook to change the basic designs proposed by the plaintiff, but directed correction thereof to meet the specific requirements.

Plaintiff says defendant's refusal to permit use of the holddown devices resulted in an "illegal" change in the terms of the contract causing the increased weight in the cranes which is sought to be recovered. The evidence on this point shows that first, the horizontal thrust increased from about 248,000 pounds to about 700,000 pounds due to the ½₀ trochoid wave condition, with the boom extended longitudinally in operating position, and holddowns and tiedowns could not have absorbed such stresses. Second, a competent engineer would have construed specification 4–01(a)(2) as meaning that the stresses resulting from the conditions therein stated, could not have been met by the use of holddowns, and that the crane boom itself would have to absorb such stresses. Third, the plaintiff's chief engineer, Mr. Blackman, testified that the only holddowns considered by the plaintiff in the preparation of its

bid were those eventually used; that the holddowns were intended to meet the stresses under specification 5–14 but not to absorb the stresses in the center castings under specification 4–05(c); that the holddowns would not absorb horizontal load but only vertical load; and that the plaintiff originally planned to use shroud-line tiedowns. In this connection Mr. Blackman admitted that in a telephone conversation with the defendant's attorney he had advised that Mr. Meyerstein had recently discussed with him the question of tiedowns and that he had told Mr. Meyerstein that he had no recollection of ever having planned to use tiedowns. Mr. Blackman further stated that he had never discussed tiedowns with any representative of the Navy, that the plaintiff had abandoned its plan to use tiedowns, and no design drawings were ever prepared for them. He also testified that it would not have been practical to use cables or shroud lines under the stress conditions of specification 4–01(a)(2) because the "boom would be up kind of high, and I wasn't sure that we would get an angle on that rope line that would be worth very much. It was one of those things again that we would have to investigate later." Fourth, Mr. Blackman testified that he never made any investigation of tiedowns at any time. Fifth, the basic design for the 125-ton cranes in suit was taken by the plaintiff from the design of the 50-ton crane which it had previously constructed for the Navy. No tiedowns were used on the smaller crane. Sixth, no mention was made by the plaintiff of holddowns or tiedowns in any letter, claim or document or in any administrative proceedings. Seventh, holddowns were used in the cranes as built, to lock the rotating platform to the crane base. No tiedowns were designed or employed.

The evidence also shows and the commissioner of this court has found that the defendant did not negligently, carelessly, recklessly, or otherwise misrepresent the weights of the cranes; that the plaintiff did not reasonably or in fact rely upon the Navy's weight estimate;

that the defendant did not threaten, coerce, or exercise any undue influence upon the plaintiff with respect to the submission of design drawings; that the plaintiff voluntarily submitted design drawings which, when reasonably corrected by the defendant, resulted in the overrun of weight in the superstructures of the floating cranes involved in this case.

Therefore, in the light of the record it must be concluded that defendant made no "illegal" changes in the contract.

From all of the evidence in this case, it is apparent that the plaintiff could have designed and fabricated the superstructures of the floating cranes so that they would have been substantially lighter in weight and still have complied with the specifications, and particularly the stress requirements of the trochoid wave condition with boom at maximum radius.

 Moreover, the weight of the evidence in this case is that it was practical and possible to design and build a superstructure for the floating crane, which would meet the specifications and stay within the estimated weights set forth on the Navy specification drawing. Plaintiff should not be permitted to recover for an injury which is due to its own fault. Shaffer v. United States, 121 F.Supp. 656, 128 Ct.Cl. 299, 313–314, certiorari denied 348 U.S. 864, 75 S.Ct. 89, 99 L.Ed. 680.

Plaintiff's third contention is that it recover the unpaid balance due under the contract in the amount of $41,275.75.

It is conceded by the Government that this sum is the unpaid balance on the contract. However, by notice of assignment dated August 28, 1945, the Reconstruction Finance Corporation notified the Chief of the Bureau of Yards and Docks, Navy Department, that the moneys due or to become due under Contract No. NOy–6303, the contract under consideration, had been assigned to the Small War Plants Corporation pursuant to the provisions of the Assignment of Claims Act of 1940, 31 U.S.C.A. § 203.

Plaintiff's counsel admitted at the hearing that such an assignment had been made and that the amount was owing to the Reconstruction Finance Corporation under the assignment and payment should be made to the Reconstruction Finance Corporation. Under these circumstances, plaintiff should not recover the unpaid balance due under the contract.

Therefore, plaintiff's petition is dismissed.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.