**HELENE CURTIS INDUSTRIES, INC.**

v.

**The UNITED STATES.**

No. 251-56.

United States Court of Claims.

Feb. 6, 1963.

Newell A. Clapp, Washington, D. C., for plaintiff. Robert M. Lichtman, Washington, D. C., was on the briefs.

Edna P. Goldberg, Washington, D. C., with whom was Acting Asst. Atty. Gen. Joseph D. Guilfoyle, for defendant.

DAVIS, Judge.

Helene Curtis, a concern better known as a purveyor of cosmetics but also possessing general experience in the compounding and packaging of more mundane chemicals, contracted with the Army in 1951 and 1952 to supply large quantities of a disinfectant chlorine powder to be used by troops in the field—the Korean hostilities were then in progress —to disinfect mess gear and fresh fruits and vegetables. This disinfectant had been developed after World War II by the Office of the Quartermaster General in conjunction with two universities and two chemical companies, one of which was Wallace & Tiernan, Inc. Wallace & Tiernan was the sole source of chlormelamine, the disinfectant's active ingredient, which in solution released chlorine molecules to kill bacteria and germs. Chlormelamine is a generic term, covering several types of a chemical with different numbers of chlorine molecules (mono-, di-, tri-, tetra-, penta-, and hexachlormelamine); the types with five or six molecules are virtually insoluble while tri-chlormelamine is adequately soluble. In 1951 chlormelamine was a new and patented chemical, and its properties were not widely or generally known. The disinfectant based on it had never been mass-produced.

When the Korean hostilities increased the immediate need for a field disinfectant of this kind, the Army prepared a specification for the product, which was issued in August 1951. This specification was very skimpy; it provided that the disinfectant (called "disinfectant, chlorine, food service") was to be "a uniformly mixed powder or granular material," composed of chlormelamine and three other ingredients in specified maximum and minimum precentages by weight. With respect to the active ingredient, chlormelamine, the specification simply gave directions as to the percentage of titrable chlorine, moisture content, and color. For the finished product, requirements were given for the percentage of titrable chlorine, solu-

bility, and particle size (among others not now pertinent).

On the basis of this specification, the Army put forth, in September 1951, an invitation to bid on a contract to supply 2,251,000 pouches of the disinfectant, all deliveries to be completed by June 1952. Plaintiff received an invitation, and began a study to see whether it should participate. Concentrating on the novel chemical chlormelamine, plaintiff's employees (a) obtained a five-pound sample of that chemical from Wallace & Tiernan, (b) formulated a small batch of chlormelamine in their own laboratory, (c) examined the technical literature on the chemical, (d) studied the military specification, and (e) compounded by simple mixing several laboratory batches of the disinfectant to be produced. As a result of its inquiries, plaintiff concluded that chlormelamine was a fine, free-flowing powder, and that the disinfectant could be produced by simply mixing that powder with the other ingredients, without any grinding of the chlormelamine particles. Plaintiff's bid was made on this basis. Of the eleven bids received by the Army, plaintiff's was the lowest, and it received the award of its first contract for the disinfectant on November 8, 1951.

Our findings portray plaintiff's tribulations in manufacturing the disinfectant after it began production in January 1952. In that month it successfully manufactured a 175-pound batch of the disinfectant, and then a 1,000-pound (production size) batch, by using a simple mixing process. But the succeeding production-size batches failed to meet the solubility test of the specification. Considerable study convinced plaintiff that simple mixing would not produce the required product but that it was necessary to grind the chlormelamine so as to reduce its particle size in order to meet the solubility standard. Grinding of the cholorine ingredient led to several production problems, and further study and experimentation was then needed to develop manufacturing techniques which would overcome these new

and unexpected difficulties—difficulties which brought increased costs and burdens. As a result of the problems encountered because of the need for grinding (as well as the blending problem, still to be discussed), the sum of plaintiff's costs on this contract exceeded its bid by over $90,000; of this amount, some $60,000 was attributable to the unforeseen need for grinding (and the complications it brought in train).

In April 1952 plaintiff was awarded a second contract, for over 3,300,000 more pouches of the disinfectant. The invitations for this contract (with the same specification) were issued on December 12, 1951, and plaintiff submitted its bid on January 17, 1952, immediately prior to the bid opening. This offer was founded on plaintiff's knowledge at that time, and still assumed that mixing would be sufficient to meet the contract requirements, without any need for grinding. An award was due to be made within 30 days of opening, but on February 4 plaintiff gave the Army an extension of 60 days to make the award. Within this extended period, plaintiff learned definitively of the necessity to grind and the resultant extra costs. It contemplated withdrawing its bid on the second contract but did not do so, nor did it seek to increase its bid; instead, it granted the Army, on April 18, 1952, a further 15-day extension within which to accept the original bid. The second contract was awarded to plaintiff on April 23d.

Even after it had discovered the need for grinding and had solved (at higher cost) the ensuing difficulties, plaintiff met serious problems in producing the disinfectant under both the first and the second contracts. It was not able to overcome these additional obstacles completely until it discovered, in December 1952, that Wallace & Tiernan, from whom it was purchasing the chlormelamine ingredient, was not shipping individual batches as they were manufactured but was blending several batches together and supplying this blended chlormelamine. At that time plaintiff

asked that only the unblended ingredient be sent to it, and thereafter its production continued without serious interruption throughout the remainder of the two contracts. Apparently the difficulties had been due to the fact that, while each batch of chlormelamine manufactured by Wallace & Tiernan was uniform in itself, there were significant and obvious differences between units. A succession of different batches each of which was uniform in itself could be handled appropriately, but blended batches caused grave trouble. Of the plaintiff's $90,000 loss on the first contract, about $60,000 was (as we have said) due to grinding problems while the remaining $30,000 flowed from the shipment by Wallace & Tiernan of these blended batches. On the second contract, plaintiff lost almost $99,000; there is no breakdown between the extra costs allocable to the grinding problem and those attributable to the blending difficulty.

Plaintiff's suit for these additional costs is founded on its claim that (a) the Army knew of the need for grinding as well as of the probable consequences of lack of uniformity in batches of chlormelamine; (b) plaintiff neither had nor had reason to have this information, as the Army knew; and (c) the Army failed to supply the information to plaintiff (either in the specification or otherwise), and this failure misled plaintiff. Alternatively, the plaintiff asserts that the specification was affirmatively misleading as to the method for making the disinfectant. In considering these claims, we first take up the problem of grinding the chlormelamine. We agree with the Trial Commissioner and find as facts that at the time of the first contract (i) the Army knew that grinding (which is more troublesome and costly than mixing) would in all probability be necessary, not because the specification required that process but because the end-product could not in fact be made without it; (ii) on the basis of the data it had or should be expected to obtain, plaintiff reasonably expected that the job could be done by simple mixing, without grinding; (iii) the Army was aware that plaintiff (and most of the other bidders) expected to produce the disinfectant without grinding; (iv) the contract specification did not inform or alert plaintiff as to the probable need for grinding; and (v) the Army did not otherwise inform plaintiff of this fact. The evidence which is summarized in the subsidiary findings sustains these conclusions of fact. Possessing special knowledge of the characteristics and uncertainties of chlormelamine as well as of the putative problems of compounding the end-product, the Government gave no hint of the necessary information, either in the specification or in the other contract documents. Rather, the Government permitted plaintiff, which it knew to be relatively innocent of these complexities, to enter a bid for this novel product and undertake a process of manufacturing which was undoubtedly planned without the significant information as to grinding possessed by defendant.

■■ The question remains whether this conduct on the part of the Government amounted to a breach of contract. The defendant insists not. It says that unforeseen difficulties do not entitle a contractor to increased compensation; that the specification in this case was an end-product specification which did not require any particular method or process of manufacturing the disinfectant; and that the Government contracted for plaintiff's technical know-how and manufacturing skills, depending on it to produce the end-product. We can accept these general propositions but they do not decide this concrete case. Where the Government has made no misrepresentations, has no duty to disclose information, and does not improperly interfere with performance, the fixed-price contractor of course bears the burden of unanticipated increases in cost (Rolin v. United States, 160 F.Supp. 264, 268–269, 142 Ct.Cl. 73, 81–82 (1958)); the Government can rightly rely on him to fulfill the agreement he chose to make.

In the same way, an end-product specification normally leaves it to the contractor to perform as best he can (John Thomson Press and Mfg. Co. v. United States, 57 Ct.Cl. 200, 209 (1922); cf. Anthony M. Meyerstein, Inc. v. United States, 137 F.Supp. 427, 431, 133 Ct. Cl. 694, 700–701 (1956)), but that does not excuse the defendant from liability if it breaches an independent duty to reveal data or if the end-product specification embodies a material misrepresentation misleading the contractor.

■ This is a case in which we have, in connection with the grinding of the chlormelamine, both a failure of the Government to tell what it should and a Government specification which in its context was actively misleading. There are many contracts—generally relating to known or standard products, or where the ratio of actual and potential knowledge definitely favors the contractor, or where a contractor can reasonably be expected to seek the facts for himself—in which the Government may be under no duty to volunteer information in its files. Cf. Shayne Bros., Inc. v. United States, 137 F.Supp. 433, 134 Ct.Cl. 154 (1956). But as our rulings show, there are other instances in which the defendant is clearly under such an affirmative obligation and cannot remain silent.[1]

■ Under the principle of these latter decisions, the circumstances here gave rise to a duty to share information. The disinfectant was novel and had never been mass-produced; the Government had sponsored the research and knew much more about the product than the bidders did or could; it knew, in particular, that the main ingredient, chlormelamine, was a recent invention, uncertain in reaction, and requiring extreme care in handling; it also knew that the more costly process of grinding would be necessary to meet the requirements of the specification, but that in their understandable ignorance the bidders would consider simple mixing adequate; and the urgency for the disinfectant was such that potential contractors could not expend much time learning about it before bidding. In this situation the Government, possessing vital information which it was aware the bidders needed but would not have, could not properly let them flounder on their own. Although it is not a fiduciary toward its contractors, the Government—where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word. Cf. Cardozo, J. in Globe Woolen Co. v. Utica Gas & Elec. Co., 224 N.Y. 483, 489, 121 N.E. 378, 380 (1918).

■ On similar grounds, we hold the specification for the disinfectant to have been misleading with respect to grinding. This was not merely a specification for an end-product, without any implications at all as to method of manufacture. To reasonable bidders it erroneously implied, in its context, that grinding would not be necessary to make the desired item; and in the circumstances defendant should have known that this would be the inference. Specifications so susceptible of a misleading reading (or implication) subject the defendant to answer to a contractor who has actually been misled to his injury. United States v. Spearin, 248 U.S. 132, 137, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Railroad Waterproofing Corp. v. United States, 137 F.Supp. 713, 719, 133 Ct.Cl. 911, 915 (1956); Arcole Midwest Corp. v. United States, 113 F.Supp. 278, 125 Ct.Cl. 818 (1953).

---

1. Ragonese v. United States, 120 F.Supp. 768, 128 Ct.Cl. 156, 161–162 (1954); Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454, 456, 458, 145 Ct.Cl. 387, 391, 393–394 (1959) (1962, 305 F. 2d 386); Snyder-Lynch Motors Inc. v. United States, Ct.Cl., 292 F.2d 907; see also General Casualty Co. v. United States, 127 F.Supp. 805, 809, 130 Ct.Cl. 520, 528 (1955), cert. denied, 349 U.S. 938, 75 S. Ct. 783, 99 L.Ed. 1266; Leal v. United States, 276 F.2d 378, 383, 149 Ct.Cl. 451, 460 (1960); Potashnick v. United States, 105 F.Supp. 837, 839, 123 Ct.Cl. 197, 218 (1952).

■ The plaintiff is therefore entitled to recover that part of its loss on the first contract attributable to the necessity to grind the chlormelamine, i. e., the sum of $60,315.38. It cannot, however, recover any comparable damages on the second contract because at the time it entered into that agreement late in April 1952 it was no longer misled. It agreed of its own choice on April 15 to extend the Government's time to make an award; on that date and for some time before it knew full well about the grinding problem. Nevertheless, it made the extension agreement with its eyes open and therefore when the contract award was subsequently made on April 23 it could no longer assert that it was relying on a misrepresentation. Cf. Anthony M. Meyerstein, Inc. v. United States, 137 F.Supp. 427, 431, 133 Ct.Cl. 694, 700 (1956); Leal v. United States, 276 F.2d 378, 383, 149 Ct.Cl. 451, 460 (1960); Ragonese v. United States, 120 F.Supp. 768, 770–771, 128 Ct.Cl. 156, 162 (1954).

■ Plaintiff's second claim of misrepresentation relates to Wallace & Tiernan's practice of blending together different batches of chlormelamine before shipping it to plaintiff; from this blending stemmed the difficulties causing one-third of the loss on the first contract and an undetermined portion of the loss on the later contract. We reject this claim. The findings do show, as plaintiff asserts, that the Army knew that the chlormelamine supplied by Wallace & Tiernan was not uniform from batch to batch, and also that the Army understood to some extent that problems would arise if this ingredient were not homogeneous. But the significant fact is that the Government did not know, or have reason to know, that Wallace & Tiernan was blending together different batches of chlormelamine. It was this blending, unknown to both plaintiff and defendant, which proximately caused those undue production difficulties which were not attributable to the need for grinding. As proved by its experience after the blending was discontinued, plaintiff could deal adequately with a varying succession of batches so long as each batch was homogeneous in itself. To hold the defendant liable for the excess costs due to blending, we would have to find both that (a) the Army was obliged to tell the bidders (in the specification or some other fashion) that the chlormelamine differed from batch to batch in chlorine content, *and* (b) the failure to impart this piece of information materially impeded the plaintiff in discovering that Wallace & Tiernan was blending different batches. Assuming but not deciding the first proposition,[2] we cannot say that there was a sufficiently close connection between the information withheld and the delayed uncovering of Wallace & Tiernan's manufacturing process. As plaintiff's own experience goes far to show,[3] the link is too tenuous to find the necessary causal relationship; plaintiff has not proved that it was in fact misled as to the existence of blending *within* batches by the failure to alert it to the variations in chlorine content between *different* batches of chlormelamine.

■ Nor can we accept plaintiff's alternative argument that the Army's specification, by providing requirements for

2. Even for a new product like this chlorine disinfectant or a new ingredient like chlormelamine, the Government would not necessarily be required to volunteer *all* of its information. The scope of the required disclosure would depend upon such factors as the state of the bidders' knowledge, the significance of the particular information to the performance of the contract, the ease of discovering the information from other sources, the Government's understanding of the importance of its information, etc.

3. Plaintiff suspected as early as May 1952 that a possible cause of its difficulties was lack of uniformity between the different batches of chlormelamine being delivered by Wallace & Tiernan. It was not until September 1952 that it definitely discovered that this was actually so and that the supplies of chlormelamine were not uniform from batch to batch. And it was not until December 1952 that plaintiff discovered that Wallace & Tiernan was blending several batches together and shipping blended chlormelamine.

the ingredient chlormelamine as well as for the end-product, warranted that a contractor using chlormelamine which met those basic requirements would necessarily be able to produce a satisfactory end-product. The ingredient provisions of the specification were minimal, not exhaustive, requirements,[4] and, except for the belief with respect to mixing the chlormelamine, there is no background from which to infer that on the basis of the specification the contractors could reasonably expect smooth sailing by simply running close to the minimal standards. The specification term "chlormelamine" was known to be a generic name for a chemical with several variations depending on the number of chlorine molecules—an all-important fact for this end-product. There was no sufficient ground for thinking that *any* "chlormelamine" within the minimal specification requirements would necessarily, without more, lead to a disinfectant meeting the demands of the specification.

 The last of plaintiff's claims relates to the "C–1 bag" problem. Plaintiff purchased the bags in which the disinfectant was to be packaged from Central States Paper and Bag Company, which furnished an affidavit that the bags passed the required Government waterproofing standard; the bags were also pre-approved and pre-accepted by an Army laboratory. Nevertheless, toward the end of September 1952, the Government's resident inspector at plaintiff's plant began rejecting the bags on hand because the bottom seam was not sufficiently waterproof. On September 29, 1952, the defendant put into effect a hold order prohibiting further use of these bags until the problem could be solved.

This order lasted 30 days, interrupting production of the final product. In the course of the hold period, some experimentation was carried on and conferences held in an effort to overcome the bottleneck. It was finally agreed toward the end of October to tape the bottom seam of the bags before they were put on the production line, and work was resumed on October 27. Plaintiff suffered $3,707.53 in excess costs during this 30-day stop order. The defendant, we hold, is responsible for these extra expenses. The bags were not adequately waterproof—through no fault of plaintiff's—but the delay of 30 days was unjustified. Much less time should have been consumed. The unreasonable duration of the stop order was due to the ambiguity of the bag specifications which caused uncertainty among defendant's representatives, and to the failure of the Government officials to accept for almost a month the suggestion made by plaintiff and Central States (on September 30, the day after the hold order was issued) to cure the defect by taping the bottom seam. Where the defendant causes an unnecessary delay of this type through a hold order, it must respond in damages for the additional costs incurred by the contractor.[5] The defendant says that plaintiff has already settled this very claim with its supplier, Central States, but we find that the damages actually recovered from that company related only to the additional costs of taping the bags once the hold order was lifted, not to the excess expenses during the period of the hold order. The present claim involves only the latter.

Accordingly, plaintiff is entitled to recover $60,315.38 (for additional costs due to the need for grinding the

---

4. Conversely, the end product particle size requirement was a maximum.

5. See Brand Investment Co. v. United States, 58 F.Supp. 749, 102 Ct.Cl. 40 (1944), cert. denied, 324 U.S. 850, 65 S.Ct. 684, 89 L.Ed. 1410 (1945); Severin v. United States, 102 Ct.Cl. 74 (1943); George A. Fuller Co. v. United States, 69 F.Supp. 409, 411–412, 108 Ct.Cl. 70, 94, 96 (1947); Volentine and Littleton v. United States, 169 F.Supp. 263, 144 Ct.Cl. 723 (1959); F. H. McGraw and Co. v. United States, 130 F.Supp. 394, 397, 131 Ct. Cl. 501, 506–507 (1955); Oliver-Finnie Co. v. United States, Ct.Cl., 279 F.2d 498; Donald M. Drake Co. v. United States, Ct. Cl. No. 501–57, decided May 3, 1961, slip op. 8; William H. Smith Contracting Co., Inc. v. United States, Ct.Cl., 292 F.2d 847.

chlormelamine on the first contract) and $3,707.53 (on the C–1 bag claim). Judgment will be entered for plaintiff in the amount of $64,022.91.

REED, Justice (Ret.), sitting by designation, JONES, Chief Judge, and DURFEE and LARAMORE, Judges, concur.