**INTERCONTINENTAL MANUFACTUR-ING CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 57–81C.**

United States Claims Court.

Feb. 17, 1984.

---

Harvey G. Sherzer, Washington, D.C., for plaintiff; Pettit & Martin, Washington, D.C., of counsel.

Robert Giertz, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Mark N. Stempler, Dept. of Navy, Washington, D.C., of counsel.

## OPINION

WIESE, Judge:

In proceedings before the Armed Services Board of Contract Appeals (the board) plaintiff, a Government contractor, sought recovery of unanticipated performance costs allegedly caused by defective Government-furnished specifications and drawings and also by the Government's failure to disclose superior knowledge. From the board's denial of relief, this appeal was brought. The contractor contends that the decision below [1] is not entitled to finality under the relevant statute, 41 U.S.C. §§ 321, 322 (1976) (the Wunderlich Act) because it contains errors of law as well as factual determinations that lack the support of substantial evidence. Plaintiff has moved for summary judgment; the Government opposes and has filed a cross-motion seeking affirmance of the administrative decision. Upon an evaluation of the case in light of the parties' briefs, relevant portions of the administrative record and the oral arguments of counsel, the court concludes that the result reached below is correct.

## FACTS

On August 12, 1970, the Naval Ordnance Systems Command awarded Intercontinental Manufacturing Company (herein also "IMCO" or plaintiff) a $629,000 contract for the manufacture, pursuant to Government specifications and drawings, of sea mine

---

1. The case is reported administratively as *Inter-* *continental Manufacturing Company,* 80–2

cases [2] and related parts including tail cover assemblies. The award was made on the basis of a competitive solicitation limited to bidders whose capabilities had been verified through a preceding technical evaluation conducted as part of the same procurement.

During the course of contract performance, IMCO encountered various difficulties in the fabrication of the sea mine cases that significantly increased expected costs. These difficulties were presented to the board as nine separate claims. The theory of entitlement (for all the claims save one) was the contractor's rightful (but detrimental) reliance upon the Government's drawings and specifications and the Government's failure to timely alert the contractor to known fabrication difficulties and their solutions. The claims in question are the following:

*Finish Claim:* The specifications required that certain of the mines' surfaces be finished to a 63 RMS or micro-inch finish. The contractor found that, because of the particular characteristics of the specified grade of steel (commercial grade denominated as AISI 1010 to 1025) it was not possible to consistently achieve the required finish through machining methods alone. That is, because of surface imperfections as well as imbedded impurities (both being known characteristics of the particular grade of steel), the metal did not always machine smoothly; therefore, plaintiff had to manually apply an abrasive cloth to the metal surface while the piece was being machine rotated. The claim is for the extra costs associated with this hand sanding—an effort plaintiff characterizes as a "non-production" technique.

*Material Claim:* In addition to its inability to consistently achieve an acceptable machine finish because of the steel's characteristics, the contractor also experienced other processing difficulties for essentially the same reasons. For example, "pipings" or laminations in the steel caused blowouts during the automatic welding process. Gas pockets, porosities and slag inclusions randomly dispersed throughout the steel caused additional weld defects. Moreover, some welds cracked because of uneven cooling where dissimilar thicknesses of the steel had been welded together. These problems required repair by hand welding. Aside from welding difficulties, the metal's characteristics also caused problems in other machining operations, such as tapping, which required additional hand finishing. Again, as with the Finish claim, the premise of the Material claim was the specified steel's unsuitability for fabrication with the use of standard production techniques—a limitation which the contractor sees as the hallmark of a defective specification.

*Strongback Claim:* Another claim that has its origins in material-based production restrictions is the Strongback claim. The "strongback" is a long bar welded to the top of each mine shell, that is, along a section of the unit's lengthwise centerline. The strongback includes drilled and tapped holes into which lifting lugs are inserted. Although IMCO had satisfactorily manufactured similar strongbacks with the same thread design in other contracts (not involving the same metal, however), it found in this instance that it could not accomplish the tapping operation exclusively by the use of standard machining operations; in fact, for the greater portion of the thread cutting operation, hand tapping was necessary. The claim is for the extra costs incurred in consequence of this unanticipated hand tapping operation.

*Tail Ring Claim:* In the aft end of the mine case, there is a steel band called the tail ring. Required machining operations on this ring included a counterbore along its inside diameter, tapped bolt holes uniformly distributed around the outer flange and

---

B.C.A. (CCH) ¶ 14,632.

2. Sea mine cases are cylindrically-shaped, high-integrity steel pressure vessels measuring roughly six feet in length and two feet in diameter. Following fabrication, they are equipped with electronic instrumentation and armed with high explosives for underwater deployment against hostile ships. The contract called for plaintiff's manufacture of 260 "MK52" mine cases and 280 "MK55" mine cases, together with related parts for both models.

four rounded "V" shaped slots, each 90 degrees apart, also cut into the outer flange. The contractor found that, in cutting the "V" shaped slots, the concentricity of the counterbore became distorted: that is, the cutting operation caused a slight inward bulging which put the counterbore "out-of-round". In order to correct this problem, plaintiff was forced to add a hydraulic jacking operation to restore the ring to its required roundness. The claim is for the extra costs of this jacking operation and for the additional reinspection procedures likewise required.

*Arming Well Claim:* Another claim involving unanticipated distortion and reworking of a counterbore tolerance is the Arming Well claim. As the name implies, the "arming well" refers to a cavity, located in the forward section of the mine shell, that houses an electronic arming device. Access to the cavity is through a 5.502-inch diameter hole. Surrounding this access hole is a 5.525-inch counterbore designed to accept an "O" ring. Six ⅜-inch holes are required to be drilled and tapped around the outer diameter of the counterbore in a circular pattern. The contractor found that the drilling and tapping of these holes in close proximity to the counterbore caused material to bulge into the outer diameter resulting in an out-of-tolerance condition. Correction of this condition required IMCO to hand work each mine case to remove the bulges and then also to reinspect the work. The claim is for this added effort.

*Filler Hole Claim:* As was the case with the two preceding claims, this claim too involves a problem of counterbore distortion. The "filler hole" is located in the forward bulkhead of the mine case; it is the access port through which the explosives are loaded. The hole assembly includes a counterbored ring or collar, bolt holes drilled and tapped around the outer diameter of the counterbore and metal studs of a special thread design inserted into these circumferential holes. The contract did not specify the depth to which these studs were to be seated; however, it did require that they not back-out upon removal of the hole cover during inspection.

The contractor's efforts to satisfy this latter requirement led it to seat the studs to a depth that caused some bulging of metal in the counterbore, resulting in an out-of-tolerance condition. The correction of this problem (later entirely eliminated by a contract modification) involved hand filing (to remove the bulge) and hand refinishing (to restore the specified 63 RMS finish). IMCO did not anticipate the necessity for this extra effort, and now claims for the costs thereby occasioned.

*Search Coil Tube Claim:* A seamless tube, made of commercial quality steel extends the length of the mine shell. Referred to as the "search coil" tube, it is welded to the inside of the outer shell perimeter at three points—at the forward and aft ends and at the intercompartmental or interior bulkhead. The tube incorporates couplings of different size diameters at each end; the aft coupling is threaded, the forward is not. The drawings required that the forward and aft couplings be aligned with each other to within five-thousandths (.005) of an inch.

The contractor found this alignment requirement extremely difficult to achieve. Despite extensive experimentation with manufacturing techniques, IMCO was never able to devise a method that enabled it to consistently meet the alignment requirement. Government rejections of misalignments occasioned costly rework for the contractor including the cutting and grinding out of the previous attaching welds. A solution to the problem came when the Government permitted the contractor to enlarge the specified diameter of the tube's forward coupling by a reaming procedure thus making the alignment coordinates less critically sensitive to a single point. In effect, then, one stated requirement was relinquished for the sake of accomplishing another. Such an accommodation is, in the contractor's view, evidence of an initially defective specification and thus the basis now for granting an equitable adjustment for the costs which were incurred in attempting to meet the original requirement.

*Search Coil Gauge Claim:* An amendment to the contract provided that the Government would furnish the gauges to be used in verifying the search coil tube's compliance with the stated requirements for length, straightness and coupling alignment. When equipment delivered by the Government turned out to be defective, the contractor used its own gauge to verify dimensional compliance. The Government, in turn, reinspected the work by using for this purpose an actual search coil. In this manner, both the contract's required "first articles" as well as a limited number of the production units were inspected and approved by the Government. Later, however, when properly calibrated gauges became available, it was discovered that the contractor's gauge was also defective. The upshot was that units manufactured by the contractor, but not yet accepted by the Government, had to be reinspected and reworked. IMCO's claim for recovery of resulting extra costs rests on the idea that, in approving the first articles, the Government thereby also approved the method of manufacture by which those units had been produced. Consequently, in light of the contractor's reliance on that approval, the Government was not at liberty to substitute inspection standards (inspection by gauge rather than the actual coil) and thereby indirectly dictate a change in an approved manufacturing procedure.

*Manometer Test Claim:* The last of the contractor's claims concerns the test procedures that it was obliged to follow to check for leaks in the internal welds of the mine case. The instrument used for this purpose, called a "manometer", is a pressure-sensitive device that relies upon an equilibrium in the water heights of a "U" shaped tube to confirm the integrity of internal welds. In the performance of this test, the contractor found the manometer to be uniquely sensitive to temperature changes thus frequently yielding false indications of weld leaks. To overcome this problem, it was necessary for IMCO to carry out the testing with the mine shell submerged in water. This approach permitted a temperature-stable environment; however, it also signifi-

cantly increased the time required for testing. The claim for the related costs rests on the fact that the specifications only identified submergence of the mine shell as a permissible test environment and not, as it actually turned out, a necessary one.

## DISCUSSION

In the presentation of its claims before the board, the contractor argued that the drawings and specifications were defective because accomplishment of the work had required resort to "non-production techniques" (the contractor's phrasing). A related contention also raised below was that the Government had failed to disclose its superior and exclusively held knowledge concerning the similar difficulties experienced by prior contractors. Neither of these arguments was upheld by the board; their rejection forms the basis of the appeal to this court. We find no error.

### The Defective Specifications Contention

Though the board dealt with each of the contractor's claims separately, it answered the contention of defective specifications in essentially the same manner in each instance. That answer, rephrased here in composite form, was this: that the planned methods of manufacture were of the contractor's own choosing and no representations as to their suitability had been made by the Government. In such a situation then, a case for defective specifications could exist only if performance had proven impossible, either actually or from a standpoint of commercial impracticability (*i.e.,* commercial senselessness). Short of these extremes, however, the risks of unanticipated performance costs remained upon the contractor's shoulders alone.

In challenging this holding, the contractor presents the argument that what was contemplated here was a production contract and not, as it perceives its efforts, design *and* production. Hence it was entitled—so the argument continues—to assume that performance could be accomplished by mass production techniques.

■ The position is correct so far as it goes. That is to say, Federal contract law does assume that, between the Government and its contractors, there exists the shared assumption that where mass procurement is involved, mass production is contemplated. *Natus Corp. v. United States,* 178 Ct.Cl. 1, 10, 371 F.2d 450, 456 (1967). This does not mean, however, that whenever accomplishment of performance requires the contractor's resort to less efficient production methods, say of the sort that were here required, that the basis of the bargain has been exceeded, *i.e.,* that the specifications have been thereby shown to be defective. Mass production does not denote a single concept, it is, rather, a variable encompassing "countless degrees between the laborious production of units, one at a time, and their rapid flow on an assembly line." *La Crosse Garment Manufacturing Co. v. United States,* 193 Ct.Cl. 168, 180, 432 F.2d 1377, 1384 (1970). Thus, properly understood, the implied promise of mass produceability means simply "that performance is possible and within the state of the art." *Natus Corp. v. United States,* 178 Ct.Cl. 1, 13, 371 F.2d 450, 458 (1967).

Cases such as *L.W. Foster Sportswear Co. v. United States,* 186 Ct.Cl. 499, 405 F.2d 1285 (1969) and *Ordnance Research, Inc. v. United States,* 221 Ct.Cl. 641, 609 F.2d 462 (1979) do not stand for any different result. Those decisions involved situations where performance was being carried out according to the Government's prescribed methods and procedures and therefore the contractor could properly assume that if the directed steps were followed a satisfactory product would result. *United States v. Spearin,* 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918).

■ There is nothing of that sort involved here. The manufacturing format which IMCO decided upon was of its own choosing submitted pursuant to a solicitation requirement asking for technical proposals from all interested contractors. Prospective bidders were advised (in the solicitation) to review all of the drawings and specifications and to conduct a production engineering study "to determine precisely the method of manufacturing the items herein." The Government played no role in the contractor's intended fabrication procedures except to confirm for itself at the outset that the proposal demonstrated sufficient technical understanding to verify the contractor's engineering competence. The risks attendant to the choice of manufacturing steps remained with the contractor.

As to the separate argument of "constructive change" which the contractor urges as the basis for recovery of its Search Coil Gauge claim (*supra* at 595), this too must be rejected. Regarding this claim, the board said, in essence, that the Government's unknowing acceptance of faulty search coil tube alignments at the outset of the work did not preclude its right to insist upon a correct alignment on subsequent production units when proper measuring devices became available.

■ The decision is correct. The fact that the Government failed to have properly calibrated inspection gauges on hand (for plaintiff's use as well as its own) might well have formed the basis for a delay claim had plaintiff in fact been without other means by which to insure the dimensional compliance of its work, and thus to continue its production. But, when plaintiff elected to use its own gauges instead, it was bound to do it right. The Government cannot be held to have constructively changed the alignment requirements of the search coil tube by accepting units whose out-of-tolerance condition it initially had no reliable means to determine.

*Superior Knowledge Contention*

The second major argument that was raised below was the contention that the Government had breached the contract by withholding information that it knew would be vital to the contractor's successful performance. The contention centers on the fact that in earlier contracts involving production of the same item, there were experienced manufacturing difficulties similar, and in some instances identical, to the problems that IMCO was later to encounter.

Out of these earlier difficulties claims arose that eventually came before the board for resolution.[3]

Though the results in these earlier suits went largely in the Government's favor, IMCO sees that fact as irrelevant to its present contention. What matters, says IMCO, is not whether these predecessor claims alleging defective specifications had been allowed or denied by the board. Rather, as plaintiff puts it, "[t]he crucial point is that serious problems *did* exist, that knowledge of the problems and also the remedies rested exclusively with the Government, that the Government knew that IMCO was unaware of the vital information, and that this knowledge was concealed from IMCO." At bottom then, the contention is that even if the need to use non-production techniques did not render the specifications defective, nevertheless the Government had an obligation to warn the contractor that successful production would require the use of such techniques.

The argument does not succeed on the facts and it cannot succeed on the law. We begin by pointing out that the Government was indeed sensitive to the problems that had gone before. It held a bidder's conference for the specific purpose of alerting contractors to some of the difficulties that had been encountered during the performance of the forerunner contracts. But of this conference, the contractor now says that the Government's disclosures were, at best, inadequate and, more often than not, misleading. The criticisms fall wide of the mark.

Take, for example, the Finish claim. The contractor argues that the Government misled it into believing that it could accomplish the required 63 micro-inch finish by machining alone because the only caution concern-ing this that was mentioned at the bidders' conference was the need to "buy your steel carefully and watch your tooling, sharpness, speed, and feed" (the Government's words). To the contractor these words are said to have implied the feasibility of a machine-accomplished finish.

Leaving aside for the moment the basic question of contractor responsibility on matters as fundamental as raw material characteristics, the immediate problem with IMCO's contention is that it only tells half the story. The fact is that the Government did caution bidders that what was being required was a "63 micro inch finish on materials with 55–70 machinability rating" —a clear reference to the fact that the required degree of finish might at times *not* be machine-attainable because of the variability in finishing response of the steel itself.[4]

Another example concerns the contractor's Strongback claim. At the bidders' conference, contractors were told that "[p]ast manufacturers have had little success with machine tapping * * * [the suspension lug holes in the strongback] because of chip clearance problems [and that] [a]ll have eventually resorted to hand tapping the finished holes."

Based presumably on these words of caution, IMCO decided upon a production method that was meant to avoid the problem of chip accumulation. In the end, however,—despite the successful avoidance of chip accumulation—IMCO still found it necessary to resort to hand tapping. Now the criticism is raised that the Government misled IMCO into believing that chip accumulation had been the only problem when, in truth, the Navy had learned through its own workshop production that hand tap-

---

3. Earlier suits concerned with the same production effort (but not involving, in every respect, the same specifications) include the following: *Drexel Dynamics Corp.,* 66–2 B.C.A. (CCH) ¶ 5860 and 67–2 B.C.A. (CCH) ¶ 6410 (decision on quantum), *Conco Eng'g Works, Inc.,* 71–1 B.C.A. (CCH) ¶ 8697 and *Canadian Commercial Corp.,* 76–2 B.C.A. (CCH) ¶ 12,145.

4. Uncontradicted testimony in the record brings home the fact that where an after-machining finish falls short of meeting the required degree of smoothness (as would be the case here, for example, where a 63 micro-inch finish was required of a metal exhibiting a machinability rating ranging as high as 70) the common practice is to apply an emery or crocus cloth to the machined part.

**598**

ping would be required regardless of the production method employed.

There is no support for this contention. The fact that the Navy may have relied upon hand tapping in an in-house fabrication effort hardly offers a sound basis for saying that hand tapping would be necessary regardless of the machining method employed. But more to the point is the fact that the Navy's reliance upon hand tapping may well have been a step whose necessity it appreciated right from the start rather than a solution that it was led to by trial and error. Indeed, such seems to have been the case with at least two of the preceding contractors.[5] Consequently, if that be the true state of affairs, then it would make little sense to fault the Navy for not calling out a production technique that it never saw as a problem in the first place.

Yet another criticism which the contractor raises concerns its Arming Well claim. At the bidders' conference, the Government brought out that if the holes adjacent to the "O" ring grooves at the arming well were tapped at high speeds then "the thin wall of hole facing the 'O' ring groove will bulge into the groove." The contractor maintains that though it endeavored to heed this advice by drilling at moderate speeds, it still

encountered the problem. Once again, then, the charge is that the Government gave misleading information by failing to point out that bulging would occur regardless of the manner in which the holes were drilled and tapped.

The shortest answer to this criticism is that there was no proof offered of any sort to indicate or even to suggest that the Government knew the bulging problem to be more than what it had said—a problem caused by high speed tapping. Absent such proof, a superior knowledge contention is meaningless.

■ Although the contractor's complaints go on (and so too the reasons for rejecting them) there is a much shorter route to the same end. That is to say, correctly analyzed, the real issue in the case is not whether the Government's disclosures were adequate but, rather, whether the Government owed a duty of disclosure in the first place.[6] From the discussion that follows, we conclude that it did not.

Cases in which the Government has been held to have breached a duty of disclosure involved situations where the information withheld was not only vital to successful

5. The board's decision in *Conco Eng'g Works, Inc.*, 71–1 B.C.A. (CCH) ¶ 8697 notes, as findings, the testimony of Government witnesses in that case who stated that two prior producers, Portland Copper and Tank Works and Drexel Dynamics had each relied upon the same hand tapping process as that followed by the Navy in their respective strongback assembly operations. *See* 71–1 B.C.A. at 40,401.

6. In reaching beyond the contractor's remaining contentions in this summary fashion, we do not overlook that special grievance it voices concerning certain answers which the Government furnished bidders in a follow-up to the bidders' conference. Specifically, at the bidders' conference, these two questions were put to the Government: "What were the technical problems that resulted in the default of Drexel Corp. and Lockley Machine Corp. in the past when they manufactured some of these components?"; "What were the technical reasons leading to Conco's claim on the Government for additional funding arising from their attempt to build these cases to these prints?" In later-distributed answers to these questions, the Government responded by saying that "[s]uch information is not germane to the

preparation of this technical proposal." The contractor decries this answer as false, misleading and an "abuse of the procurement process". Had the questions been truthfully answered—so the argument continues—IMCO would have had occasion to find out about prior production difficulties through direct inquiry rather than to have assumed that there were no "deficiencies in the specifications" (the contractor's wording).

The argument is more than a bit disingenuous. Granted, the Government might have answered the stated questions better, the fact remains, however, that the technical problems experienced by the named contractors (and by others as well) were the very problems which the Government *had* aired at the bidders' conference. Therefore, to contend, as IMCO now does, that the Government's answers to the given questions disarmed it from learning the truth about satisfying the specifications is equivalent to saying that the contractor learned nothing at all from the bidders' conference. That may well have been the case but, if so, it certainly was not the Government's fault.

performance but, more important, was information of a character which the Government knew, or should have known, the contractor was neither aware of nor reasonably likely to become so. For example, in *Hardeman-Monier-Hutcherson v. United States,* 198 Ct.Cl. 472, 458 F.2d 1364 (1972), a limited bidding period made it impossible for the plaintiff to make its own studies of the unusual wind and sea conditions at the site where it was to construct a pier for the Navy. Yet even after a specific request from the plaintiff, the Government refused to disclose information in its possession relating to those conditions. In *Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 312 F.2d 774 (1963), a specification for a "mixture" identified the constituents only in terms of maximum and minimum percentages by weight and failed to inform bidders that grinding of the main ingredient—a novel chemical of recent invention whose interactive properties were not widely or generally known—would be required. Similarly, in *Snyder-Lynch Motors, Inc. v. United States,* 154 Ct.Cl. 476, 292 F.2d 907 (1961), plaintiff was obliged, for lack of any outside sources of information, to rely upon a Government estimate of the likely cost of replacement parts in a contract for tank engine overhauls. By the time the contract was let, the Government knew the figure it had provided was wrong yet it failed to advise the contractor to that effect.

The present case does not fit with these precedents. The fabrication effort required here may have been a difficult one—a "fairly complex weldment" involving "a good deal of learning" as one witness put it—but success did not depend upon the application of new or novel techniques or demand the use of uncommon skills. Nor were there specifications and drawings involved here that could have led a contractor to reasonably assume one set of working conditions while another proved true. Rather, as pointed out, the case for imposing upon the Government a duty of disclosure proceeds entirely upon the assumption that since manufacturing difficulties of varying degrees had been experienced by all prior contractors, it could reasonably be anticipated that IMCO too would come to share this plight and that it was the Government's responsibility to forestall that occurrence.

■ As appealing an argument as this might be, it is simply too large an assumption to rest upon. It is important to recognize that with an end-product specification such as is here involved, an imposition upon the Government of a duty of disclosure regarding manufacturing processes and techniques, accomplishes, in practical terms, a reallocation of the performance risks normally shouldered by the fixed-price contractor. Caution demands, therefore, that before such a shift in contractual obligations be enforced, the record substantiate that the performance difficulties likely to be encountered exceed a rightfully expected level of skill and competence of the industry.

In the demonstration of this point, the experience of other contractors is, of course, a relevant consideration. But proof that relies only upon a cataloging of those experiences is not enough. Since we are litigating this case and not some other, it is incumbent upon the aggrieved contractor to explain why, in this procurement, it would have been beyond its properly expected skills and abilities to have foreseen the manufacturing problems that were encountered and the solutions they demanded. To recognize a duty of disclosure on any lesser basis—to require it, for example, simply because claims arose in past procurements—would carry with it the real possibility of obliging the Government to assume the duty of informing the contractor about what it ought to know on its own. To put it another way, adherence to plaintiff's basis for disclosure runs the distinct risk of elevating substandard performance into an industry norm.

This is more than just an academic concern. Consider again, for example, the contractor's Finish claim. To recall, that claim arose because IMCO had not anticipated the need for hand sanding to achieve the required 63 micro-inch finish and it faults the Government (erroneously so) for not having

made known the necessity for such sanding. Yet the testimony bearing on this point was that it was a recognized characteristic of the steel specified in the contract that it did not machine smoothly; more particularly, that it was a common expectation in the industry—more often encountered than not—to have to resort to hand sanding in order to achieve a 63 micro-inch finish following a machining operation.

■ Placing this testimony into the context of the contractor's argument means that the Government would owe a duty of disclosure even as to matters of industry practice. The position is unreasonable on its face. One who is in the business of understanding and applying the machining techniques and skills necessary to translate a drawing design into a fabricated end product must be held to be aware of the limiting characteristics of those common materials he may be called upon to work with. To have it any other way would oblige every buyer to become his own expert—hardly a plausible idea. In the court's view, then, those claims deriving from IMCO's failure to appreciate the fabrication constraints of its source materials—the Finish claim, the Material claim and the Strongback claim—do not involve deficiencies in knowledge of the sort which the Government was obliged to anticipate.

And even as contractors should be expected to know the processing limits of fabrication materials common to their trade, so also should they be able to evaluate a given design with a view to formulating the processing steps that will be required in order to fabricate the depicted product. It is, after all, as much their expertise in this regard which a buyer bargains for as it is their physical accomplishment of the work.

■ Therefore, when considering a claim such as the Tail Ring claim (typical, in the court's mind, of those several claims where a dimensional distortion occurred during processing that required the addition of a corrective step) it is difficult to understand why this added effort should warrant added compensation. Plainly, the contractor accomplished no more than it had contractually obligated itself to do. The contractor's answer, of course, is that the Government had encountered the problem at least twice before, so on that ground alone it should have recognized an obligation to speak. But that answer, as the court has said, only begs the question. The doctrine of superior knowledge is not aimed at compelling disclosure whenever the Government knows more than the contractor *might,* its aim, instead, is to address those situations where the Government knows more than the contractor *should.*

And so the real issue the contractor faces here is to explain why distortion of the tail ring's concentricity following the cutting of the "V" shaped slots should not or could not have been anticipated. So far as the court has been made aware, there is no evidence explaining this. We are left, therefore, with the distinct possibility that the problem was one which a more competent contractor would have foreseen thereby avoiding it altogether or else anticipating the additional cost in the bid price.

To sum up, the contractor has not shown that its claims were borne of problems exceeding the industry's knowledge, practices and skills; it cannot, therefore, be heard to say that the Government withheld *superior* knowledge.

## CONCLUSION

For the reasons stated, defendant's cross-motion for summary judgment is granted; plaintiff's motion for summary judgment is denied and the complaint is to be dismissed.