ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| L.S. Black-Loeffel Civil Constructors JV | ) ASBCA No. 62402 |
| | ) |
| Under Contract No. W912ES-18-C-0004 | ) |

APPEARANCES FOR THE APPELLANT: Reginald M. Jones, Esq.
Tara Hosseini, Esq.
Diana McGraw, Esq.
Nicholas T. Solosky, Esq.
  Fox Rothschild LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Molly M. Hunt, Esq.
Simon R. Rutherford, Esq.
  Trial Attorneys
  U.S. Army Engineer District, St. Paul

OPINION BY ADMINISTRATIVE JUDGE WOODROW
ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

This appeal addresses who should pay for the costs of delays in the construction of a lock end cell in the Mississippi River. As explained later in the decision, a lock end cell is a large concrete structure protecting the guidewalls at the entrance of the lock channel from strikes by barge traffic entering the lock. The contractor, L.S. Black-Loeffel Civil Constructors JV (L.S. Black), claims that the U.S. Army Corps of Engineers (Corps) is responsible for delaying the project into a period of colder weather and forcing L.S. Black to install a costly thermal break to control the temperature of the concrete in the end cell. L.S. Black also claims that the Corps withheld information about the design and construction of a previous guidewall extension and end cell on the Mississippi River that would have changed how L.S. Black budgeted for the project.

Count I of L.S. Black's complaint alleges government-directed changes and government caused delays; Count II alleges a claim for differing site conditions; while Count III alleges a breach of the duty of good faith and fair dealing. On August 13, 2021, the Board granted leave for appellant to amend its complaint to add Count IV, which alleged a breach of the implied duty to disclose superior knowledge.

The government has filed a motion for summary judgment as to each of L.S. Black's claims. L.S. Black has filed for summary judgment as to all of the counts in its complaint except for its claim of differing site conditions. On April 7, 2022, the Board held an oral argument regarding the parties' cross-motions for summary judgment.

We grant summary judgment in favor of the government as to all four counts of appellant's amended complaint. Accordingly, we deny the appeal.

<u>STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION</u>

The following facts are undisputed or uncontroverted.

**A. The Contract**

1. On February 20, 2018, the U.S. Corps of Engineers, St. Paul District, awarded firm fixed-price Contract No. W912ES-18-C-0004 to L.S. Black in the amount of $3,075,576 for the construction of a large concrete end cell at Lock and Dam No. 6 on the Mississippi River (R4, tab 17). The end cell protects the guidewalls at the entrance of the lock channel from strikes by barge traffic entering the lock. Guidewalls are long extensions of the lock walls, in either the upstream or downstream direction, that are parallel to the lock wall. Guidewalls serve primarily to guide the long tows into the lock and to provide mooring facilities for tows too long to be accommodated in a single lockage. The end cell is an approximately forty-foot-wide sheet pile cell filled with cement at the end of the guidewall (R4, tab 17; https://www.mvp.usace.army.mil/Home/Projects/Article/1121179/mississippi-river-lock-and-dam-6-guidewall-end-cell/).

2. Prior to bidding on the contract, L.S. Black consulted with an engineer regarding the need for special measures for the construction of a concrete end cell during the winter season when the river becomes non-navigable (R4, tab 105 at 7-8). Prior to bidding on the contract, L.S. Black also consulted with two of its subcontractors regarding end cells previously constructed in the Mississippi River (R4, tab 105 at 7-8).

3. The original contract completion date was February 28, 2019 (R4, tab 1 at 47)[1].

---

[1] The government numbered pages in its Rule 4 file with a prefix of letters and leading zeros. We have dropped the prefix and leading zeros and just cite the numeric page number.

4.   The contract contained Federal Acquisition Regulation (FAR) 52.236-2, DIFFERING SITE CONDITIONS (APR 1984), FAR 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984), FAR 52.236-15, SCHEDULES FOR CONSTRUCTION CONTRACTS (APR 1984), FAR 52.236-21, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997) – ALTERNATE I (APR 1984), FAR 52.242-14, SUSPENSION OF WORK (APR 1984), and FAR 52.249-10, DEFAULT (FIXED PRICE CONSTRUCTION) (APR 1984) (R4, tab 1 at 122-23, 127-30, 140-41).[2]

5.   In addition, the contract contained FAR 52.236-4, PHYSICAL DATA (APR 1984) which included the following specific disclaimer language:

> Data and information furnished or referred to below is for the Contractor's information.  The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor.
>
> . . . .
>
> (d)  River Conditions:  Hydrographs of the river stages are indicated on the drawings.  Actual water levels may vary from those indicated on the historic hydrographs.  The contractor has the responsibility to schedule its operations to take advantage of the most favorable river stages.
> (End of clause)

(R4, tab 1 at 123)

6.   The contract contained detailed instructions at Clause 52.236-4061 OBSTRUCTION OF CHANNEL relating to the obstruction of the river during construction:

> The Government will not undertake to keep the channel free from vessels or other obstructions, except to the extent of such regulations, if any, as may be prescribed by the Secretary of the Army, in accordance with the Provisions of Section 7 of the River and Harbor Act approved August 8, 1917.  *The Contractor will be required to conduct the work in such manner as to obstruct navigation*

---

[2] Tab 1 is identified as Solicitation No. W912ES-17-B-0007 and appears to be the solicitation underlying the parties' contractual arrangement.  As both parties treat the solicitation as if it were the contract, so will the Board.

3

*as little as possible.* The Contractor shall consult with the appropriate Coast Guard office to determine whether a Notice to Mariners will need to be issued for construction-related activities that might interfere with navigation or be interfered with by such navigation. . . . If the Contractor's plant so obstructs the channel as to make difficult or endanger the passage of vessels, said plant shall be promptly moved on the approach of any vessel to such an extent as may be necessary to afford a practicable passage. Upon the completion of the work the Contractor shall promptly remove his plant, including ranges, buoys, piles, and other marks placed by him under the contract whether in navigable waters or on shore.

(R4, tab 1 at 171) (emphasis added)

The contract also included provisions for performing work during the navigation season,[3] such as providing information on lock closures and requirements for a navigation plan and helper boats, indicating that construction during the navigation season also was an option for the contractor (R4, tab 1 at 171, 242).

7. The contract contained the following provision relating to the project schedule, at Section 01 32 01.00 13, Paragraph 3.1:

Pursuant to the Contract Clause, SCHEDULES FOR CONSTRUCTION CONTRACTS (FAR 52.236-15), a project schedule as described below shall be prepared. The scheduling of construction shall be the responsibility of the Contractor. Contractor management personnel shall actively participate in its development. Subcontractors and suppliers working on the project shall contribute in developing and maintaining an accurate project schedule. The approved project schedule shall be used to measure the progress of the work, to aid in evaluating time extensions, and to provide the basis of progress payments.

(R4, tab 1 at 254-55)

---

[3] There are times of the year that this portion of the Mississippi River is navigable and there are times it is not. The time that it is open is referred to as the navigation season.

8.  The contract required the contractor to submit specific items for government approval and gave the contracting officer (CO) discretion to require additional submittals.  Section 01 33 00, Submittal Procedures, provided:

> Paragraph 1.2.1 Government Approved
>
> Governmental approval is required for extensions of design, critical materials, deviations, equipment whose compatibility with the entire system must be checked, and other items as designated by the Contracting Officer. . . .
>
> . . . .
>
> Paragraph 1.4 Disapproved Submittals
>
> The Contractor shall make all corrections required by the Contracting Officer and promptly furnish a corrected submittal in the form and number of copies specified for the initial submittal.  If the Contractor considers any correction indicated on the submittals to constitute a change to the contract, a notice in accordance with the Contract Clause 52.243-4 "Changes" shall be given promptly to the Contracting Officer.

(R4, tab 1 at 261-64)

9.  The contract gave the government 30 days to approve submittals, and required the contractor to set forth in writing any deviations from the design:

> Paragraph 3.3 Scheduling
>
> 30 days (exclusive of mailing time) shall be allowed and shown on the register for review and approval. . . .
>
> . . . . .
>
> Paragraph 3.5.5 Deviations
>
> For submittals which include proposed deviations requested by the Contractor, the column "variation" of ENG Form 4025 shall be checked.  The Contractor shall set forth in writing the reason for any deviations and annotate such deviations on the submittal.  The

5

Government reserves the right to rescind inadvertent
approval of submittals containing unnoted deviations.

(R4, tab 1 at 263-64)

10. Section 2.2 of the contract contained general requirements for the composition, aggregate size, air content, and compressive strength of the mass concrete. However, the contract did not require a specific concrete mix. (R4, tab 1 at 436-37).

11. Section 2.2.8 of the contract provided that:

The contractor shall be responsible for developing an optimum mixture design with special considerations for concrete mixture(s) intended to be placed both above and below water. These mixtures shall be proportioned to reduce or control the heat of hydration and the resulting temperature rise to avoid damaging the concrete through excessive temperatures and temperature differences. . . .

(R4, tab 1 at 438)

12. The contract required the contractor to submit a thermal control plan and specified the following requirements for the thermal control plan.

Paragraph 2.2.5 Thermal Control Plan(s)

The maximum allowable temperature and maximum temperature differential shall not exceed 160°F and 35°F, respectively. A minimum of 20 minutes prior to placement, the concrete temperature must not exceed the limits of 40 to 85°F [w]hen measured in accordance with ASTM C1064/C1064M. The thermal control plan shall state the anticipated temperatures and temperature differentials. It shall address the corrective measures that will be taken if these become excessive. It shall address the maximum concrete placement temperature, the concrete mix, and the thermal controls to be used. The thermal control plan shall include all methods, materials, and equipment the contractor intends to use to control the maximum concrete temperature and temperature differential including the timing of application and removal

6

of the controls.  The plan shall also include the temperature monitoring that will be performed.

(R4, tab 1 at 437)

### A.  Contract Performance

13.  The contract required L.S. Black to begin performance within 10 calendar days after receiving the notice to proceed (R4, tab 1 at 2).

14.  The Corps issued the Notice to Proceed to L.S. Black on March 29, 2018, and L.S. Black acknowledged the notice on March 30, 2018 (R4, tab 18).

15.  On May 17, 2018, L.S. Black submitted its initial schedule.  The schedule did not specifically include a thermal control plan submittal.  The initial schedule called for mass concrete submittals (item S1100) to start April 2, 2018, and end on August 30, 2018.  The first and second pours of mass concrete (item C1080) were scheduled to begin on January 8, 2019.  Beginning on January 28, 2019, L.S. Black would install steel armor plate on the exterior of the end cell (item C1110).  The purpose of the armor plate is to protect the concrete from impacts from boat traffic.  The third and final pour of mass concrete (C1130) would start on February 7, 2019, following the installation of the armor plate.  The substantial completion date was February 28, 2019 (item M1040).  (R4, tab 67 at 2141, 2143)

16.  On July 18, 2018, the parties executed Modification No. A00001 to extend the completion date 14 calendar days from February 28, 2019 to March 14, 2019.  The modification also changed the non-navigation window from November 22, 2018 through March 4, 2019 to December 2, 2018 through March 14, 2019.  (R4, tab 11 at 699)

17.  L.S. Black subcontracted with a geotechnical consultant, Braun Intertec Corporation (Braun Intertec), to perform specialized work related to the mass concrete specifications, including developing the thermal control plan (R4, tab 88 at 3385, 3390).

18.  In October 2018, Braun Intertec conducted theoretical models of several different scenarios "in order to determine the means and methods of meeting the specifications for placing the concrete end cell" (R4, tab 105 at 11).  In a letter to L.S. Black dated November 6, 2018, Braun Intertec discussed a range of methods for meeting the thermal control requirements, including lowering the concrete temperature and insulating the interior face of the sheet pile (R4, tab 20 at 742).  Appellant elected to meet the thermal control requirements by providing a thermal break within the end cell, consisting of an insulated precast panel on the interior of the sheet pile that would

7

later be grouted in place (R4, tab 60 at 2007). Other available methods would not have involved adding a permanent structure to the end cell (e.g., heating the outer portion of the concrete) (R4, tab 20 at 742).

19. On October 18, 2018, L.S. Black submitted a schedule for mobilization and the first pours of mass concrete. The schedule stated that mass concrete submittals (item S1100) had started on August 28, 2018, and would end December 4, 2018, and that L.S. Black would mobilize to the site (item M1015) on December 3, 2018. The first pours of mass concrete (item C1070) were scheduled to begin January 3, 2019. L.S. Black's schedule did not expressly provide for a thermal control plan submittal. (R4, tab 68 at 2144, 2146)

20. On November 7, 2018, L.S. Black wrote Contractor Serial Letter No. H-0003 in which it forwarded the letter from its subcontractor, Braun Intertec, stating that Braun "agree[d] with the maximum temperature differential of 35 F, considering the concrete is unreinforced." (R4, tab 20 at 740)

21. On November 20, 2018, in Serial Letter No. C-0007, the government responded that L.S. Black should "submit a Thermal Control Plan that provides the means and methods to control the maximum concrete temperature and temperature differential as required by the contract" (R4, tab 23).

22. On November 28, 2018, L.S. Black submitted a new schedule, stating that its mass concrete submittals were completed on November 15, 2018, and that it mobilized to the site on November 28, 2018. The schedule stated that it would install metal sheet piling on December 3, 2018 and December 11, 2018, and that it would begin its first pour of mass concrete on December 26, 2018. These two activities were shown in red and designated as "Critical Remaining Work." (R4, tab 69 at 2148)

**1. Thermal Control Plan Submittals**

23. On December 14, 2018, L.S Black submitted its first thermal control plan submittal (R4, tab 60 at 2004). The submittal consisted of a letter from Braun Intertec to L.S. Black with a subject line of, in part, "Concrete Thermal Control Approach" (R4, tab 60 at 2006). The letter described what would be included in a future thermal control plan (R4, tab 60 at 2010). The Lock and Dam No. 6 thermal control requirements were based on two numbers, namely the maximum temperature and the maximum temperature differential, which the Corps determined were necessary to prevent thermal cracking. Appellant elected to meet the thermal control requirements by providing a thermal break within the end cell. (R4, tab 60 at 2007-10)

24. On December 21, 2018, the government disapproved the first thermal control plan submittal. The government noted that a full thermal control plan was

8

necessary and that the submittal appeared to only be a portion of a plan. (R4, tab 60 at 2005)

25. On December 26, 2018, appellant submitted a schedule stating that it would begin sheet pile placement on December 23, 2018, install metal sheet pile on December 27, 2018, and begin pouring mass concrete on January 9, 2019 (R4, tab 70 at 2152)

26. In a letter dated January 4, 2019, from Alf Gardiner with Braun Intertec to Josh Lester with L.S. Black, Mr. Gardiner stated in part:

> This submittal [the first thermal control plan submittal] was not a thermal control plan. It was a submittal to provide the approach and addition of precast members to the cell. We are still conducting the trial batching and thermal modeling of the cell. When this work is complete, we will provide a final plan in which the intent will be to maintain the maximum differential of 35ºF.

(R4, Tab 91 at 3796)

27. On January 12, 2019, L.S. Black submitted its second thermal control plan submittal (R4, tabs 61 at 2013). This submittal stated that it was a "conceptual approach" and that "[o]nce the concrete mixture is tested and the heat of hydration is measured, a model of the system will be conducted, and a thermal control plan will be provided." (R4, tab 60 at 2007).

28. On January 18, 2019, the government disapproved the second thermal control plan submittal (R4, tab 61 at 2014). Among other issues, the government noted that the submittal contained incorrect elevations and that the thermal model was shown as being conducted using average air temperature instead of water temperature. (R4, tab 61 at 2014).

29. On January 24, 2019, L.S. Black submitted its third thermal control plan submittal (R4, tab 62 at 2048). The submittal consisted of a letter dated January 21, 2019 from Braun responding to the Government's comments on the second submittal (R4, tab 62 at 2052-57).

30. On January 25, 2019, the government required resubmission of L.S. Black's third submittal (R4, tab 62 at 2049). However, the Government agreed with the proposed resolution of several of the Government's previous comments and requested that the resolutions be implemented and resubmitted for approval (R4, tab 62 at 2049-51).

31.  On January 25, 2019, L.S. Black submitted its fourth thermal control plan submittal (R4, tab 63 at 2058).  On February 4, 2019, the government required L.S. Black to resubmit it's fourth thermal control plan submittal, stating that it needed more information regarding the placement and composition of the grout (R4, tab 63 at 2059).

32.  On February 8, 2019, L.S. Black submitted its fifth thermal control plan submittal to the Government (R4, tab 64 at 2117).  On February 13, 2019, the government approved the fifth thermal control plan submittal, but asked L.S. Black to resubmit the plan for two issues (R4, tab 64 at 2118).  L.S. Black acknowledges that its thermal control plan was approved on February 13, 2019 (R4, tab 105 at 15).

33.  On February 13, 2019, L.S. Black submitted its sixth thermal control plan submittal (R4, tab 65 at 2123).  Two days later, on February 15, 2019, L.S. Black began installation of the pre-cast panels for the thermal break (R4, tab 58 at 1364 (listing under heading "Work Performed Today" that it "[s]tarted setting thermal Control Panels")).  On February 20, 2019, the governmental formally approved L.S. Black's sixth thermal control plan submittal (R4, tab 65 at 2124).

## 2.  Mass Concrete Installation

34.  On February 23, 2019, L.S. Black began its first pour of mass concrete (R4, tab 058 at 1378).  On March 7, 2019, L.S. Black completed the second pour of mass concrete (R4, tab 58 at 1402).

35.  On March 14, 2019, the parties executed Modification No. A00002 to extend the completion date 13 calendar days from March 14, 2019 to March 27, 2019.  The extension was due to weather days in December 2018, January 2019, and February 2019.  (R4, tab 12 at 701)

36.  Beginning on March 17, 2019, high water on the Mississippi River affected L.S. Black's work on pouring mass concrete until approximately June 18, 2019 (R4, tab 105 at 18; tab 58 at 1424-1562).

37.  On June 20, 2019, L.S. Black completed the third and final pour of mass concrete (R4, tab 58 at 1566).

## 3.  Armor Plate Installation/

38.  Appellant's January 30, 2019 schedule called for the armor plate to be installed from February 4 to February 13, 2019, with the first pour of mass concrete to occur shortly after on February 18, 2019.  The schedule called out "Install Armor

at PS31 Metal Sheet Piling" in red print, which was designated as "Critical Remaining Work." (R4, tabs 71 at 2156, 104 at 3756)

39. Appellant's steel supplier, Southwest Steel Fabrication, encountered delays in fabricating the steel for the armor plate. In an email dated February 5, 2019, from Caleb Clay with Southwest Steel Fabrication to Josh Lester with L.S. Black, Mr. Clay states in part, "[The] A12 [armor plate] has not been completed. Our shop is telling me the last plate on that radius armor is in the process of getting rolled. Our best estimate on shipping is earliest at 3 weeks from today, but will most likely be 4 weeks . . . ." (R4, tab 100 at 3820). The armor plate identified as A12 by Southwest Steel Fabrication was the armor plate on the PS31 sheet pile (R4, tabs 79 at 736 (detail A3), 2 at 586 (detail A3)).

40. L.S. Black replied the same day, stating in part, "[t]his is unacceptable. . . . I don't see anything from Southwest Steel until now stating that Armor steel was this far out. Timely [sic] installation of this armor could cause a delay to the project, and any costs incurred as a result of that delay would be the responsibility of Southwest Steel." (R4, tab 100 at 3819-20) The next day, L.S. Black wrote to Southwest Steel stating in part, "[i]nstallation of the armor is starting. We need an update. As previously noted, any delay/impacts to the product as a result of this matter will be the responsibility of Southwest Steel." (R4, tab 100 at 3818)

41. On February 11, 2019, L.S. Black asked for an update on the armor plate and again stated that "any additional cost incurred by the team due to this armor delay will be put back to Southwest Steel" (R4, tab 100 at 3815).

42. On February 25, 2019, L.S. Black again wrote to Southwest Steel Fabrication, stating in part "[a]s noted in previous emails, this is a critical path item and Southwest Steel will be held responsible for any repercussions stemming from this late delivery issue" (R4, tab 100 at 3813-14).

43. The same day, Southwest Steel Fabrication indicated that "It's a taking a [sic] more time to fabricate than originally thought. We have the pieces back from being rolled, but the work is extensive. The latest delivery date we anticipate is 3/8. . . ." (R4, tab 100 at 3813)

44. On March 7, 2019, Southwest Steel finally shipped the armor plate for the end cell (the A12 plate) (R4, tab 33 at 865).

45. Due to delays in the delivery of the armor plate material, L.S. Black rescheduled the installation of the armor plate until after the final pour of mass concrete. L.S. Black's February 28, 2019 schedule shows "Install Armor at PS31

11

Metal Sheet Piling" (Line C1130) as occurring on March 10, 2019, after the final pour of mass concrete (Line C1134) on March 7, 2019 (R4, tab 72 at 2157).

46. L.S. Black subcontracted with JF Brennan Company, Inc. (JF Brennan) to perform underwater excavation, underwater rip rap and bedding placement, and placement of sheet piling (including the A12 armor plate) (R4, tab 78). According to JF Brennan, it incurred $233,233.74 in additional costs due to the delay in delivering the armor plate (R4, tab 103 at 890). Specifically, Brennan argued that it was required to re-sequence its work activities around high water levels at the Project site as a direct result of the delayed armor plate delivery (R4, tab 103 at 890).

47. On July 18, 2019, L.S. Black requested that the Government suspend work on the armor plate installation due to the high water levels. L.S. Black contended that the installation of the armor plate was unnecessary because any ship entering the lock would float above the armor plate. L.S. Black further contended that installing the armor plate would be unsafe due to the strong currents and limited underwater visibility from high turbidity. L.S. Black stated that it would consider it a directed change if the Government did not suspend the work. (R4, tab 039)

48. On July 19, 2019, the government responded, stating that it would not suspend operations and that "[t]he contractor is solely responsible for scheduling and constructing the project as required by the plans and specifications. Also, the contractor is solely responsible for site safety. . . . A suspension of work issued by the Government is not necessary or proper in these circumstances." (R4, tab 40 at 879) The government also offered a time extension due to the unusually severe weather and offered to consider an alternate method to protect the structure from barge strikes in lieu of a helper boat (*id.* at 879-80).

49. The same day, L.S. Black again requested that the government suspend work (R4, tab 41). In response, the government offered Modification No. A00004 to extend the completion date by 214 days under the Default clause to account for the weather delay, but the parties did not agree to the terms and the contract was not modified (R4, tab 51 at 920-21).

50. On September 11, 2019, L.S. Black substantially completed the armor plate installation (am. compl. ¶ 73; R4, tab 59 at 1991-92). On September 12, 2019, the Corps transmitted a list of deficiency items to L.S. Black (R4, tab 49). L.S. Black did not return to the site until November 4, 2019 to work on the deficiency list (R4, tab 56 at 11). On November 5, 2019, L.S. Black resolved a portion of the outstanding deficiencies (R4, tabs 56 at 11, 59 at 2001).

## B. Procedural History

51. On July 24, 2019, prior to completion of the contract, L.S. Black submitted a Request for Equitable Adjustment (REA) in the amount of $1,1800,000 (R4, tab 53 at 933, 940). L.S. Black asserted that the government's alleged delay in approving its thermal control plan violated the duty of good faith and fair dealing (*id.* at 939). L.S. Black also alleged that the high water levels constituted a differing site condition. In its letter, L.S. Black acknowledged that the "[c]ontract contained performance specifications that set forth an objective but did not describe the means and methods in which the work is to be performed" (*id.* at 939).

52. On September 5, 2019, L.S. Black amended its REA to include additional costs relating to unusually high water levels that impeded its ability to install the armor plating, alleging that the government's refusal to suspend work on the armor plate installation caused it to incur additional costs during the armor plate installation, bringing its total costs to $1,431,752.27 (R4, tab 53 at 938-41).

53. On September 26, 2019, L.S. Black converted its REA into a certified claim in the final amount of $1,486,509.98 (R4, tab 52).

54. On January 27, 2020, the CO issued a final decision denying L.S. Black's claim in its entirety (R4, tab 56).

55. On February 18, 2020, L.S. Black filed a notice of appeal from the CO's final decision and, on February 20, 2020, filed its initial complaint.

## C. Amended Complaint Concerning the Lock and Dam 3 Contract

56. After initial discovery had taken place, on June 11, 2021, L.S. Black filed a motion to amend its complaint to add a count alleging that the Corps withheld superior knowledge regarding the design and construction of a previous guidewall extension and end cell on the Mississippi River that would have changed how L.S. Black budgeted for the project. The Corps opposed L.S. Black's motion to amend the complaint on the grounds that the Board lacked jurisdiction to entertain the new count, because it was not based upon the same operative facts as the original claim that was the subject of the CO's final decision. On August 13, 2021, we held that we possess jurisdiction to entertain L.S. Black's amended complaint, reasoning that the Board would review substantially the same evidence and facts to evaluate the superior knowledge claim as appellant's original claim, specifically the facts surrounding the government's review of appellant's thermal control plan.

57. In June 2010, the Corps entered into a design-build contract for Lock and Dam No. 3, located on the Mississippi River near Red Wing, Minnesota. The Lock

and Dam No. 3 Navigation Improvements Contract (W912ES-10-C-0007), which included an end cell, was a design-build contract that the Government did not design. (R4, tab 106 at 4063-66)  The specifications for the Lock and Dam No. 3 contract did not include the same thermal control plan requirements as the Lock and Dam No. 6 contract at issue in this appeal.  Specifically, the Lock and Dam No. 3 contract did not include a maximum temperature differential, whereas the Lock and Dam No. 6 End Cell contract had a maximum temperature differential of 35 degrees (R4, tabs 1 at 437, 106 at 4575-76).

<u>DECISION</u>

### I.  Standard of Review

We grant summary judgment only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that may affect the outcome of the decision.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248-49 (1986).  The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment.  *Mingus Constructors*, *Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).  At the summary judgment stage, the Board does not resolve controversies, weigh evidence or make determinations of credibility, but draws all reasonable inferences in favor of the non-moving party.  *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 17-1 BCA ¶ 36,710 at 178,759.

### II.  Count I – Constructive Change and Government-Caused Delays and Defective Specifications

In Count I of its amended complaint, L.S. Black seeks $1,486,509.98 in damages and a time extension of 223 days to extend the contract completion date to November 5, 2019.  Relying on FAR 52.243-4, Changes, L.S. Black alleges that the government:  (1) issued defective specifications for the thermal control plan and concrete work; (2) delayed and mismanaged its review of L.S. Black's thermal control plan; and (3) refused to suspend installation of the armor plate until the river level receded.

We address each of these allegations in turn.

### A.  Defective Specifications

In its cross-motion for summary judgment, L.S. Black contends that the thermal control plan specifications were defective, because they did not specify that a thermal break would be required if the work was performed during the non-navigable (winter)

14

season (app. mot. at 15).  Specifically, L.S. Black contends:  (1) that the specifications did not call for a thermal break; (2) the work could not be performed in the winter without a thermal break; and (3) the government approved a final thermal control plan that called for the installation of a thermal break.

In response, the government contends that the thermal control plan specifications were *performance* specifications rather than *design* specifications and, therefore, not subject to a defective specifications claim.  According to the government, the thermal control plan specification called for a maximum allowable temperature and maximum temperature differential during the concrete curing process but did not specify *how* the contractor would achieve these criteria.  (Gov't mot. at 23)  Moreover, the contract did not specify when the concrete would be poured for the end cell construction, leaving it up to the contractor to make that determination (gov't resp. at design15).  Finally, because the contract was structured as a design-bid-build contract, the government would have no way of knowing ahead of time when the end cell construction would occur (or, for that matter, what contractor would win the job).

The government is absolutely correct about the law:  a defective specification cause of action only applies to defective design specifications; it does not apply to allegedly defective performance specifications.  *See White v. Edsall Constr. Co.*, 296 F.3d 1081, 1084 (Fed. Cir. 2002) (citing *United States v. Spearin*, 248 U.S. 132, 137 (1918)).  Thus, in resolving this portion of the parties' cross-motions for summary judgment, our first task is to determine whether there is a genuine issue of material fact in dispute relating to the type of contract specifications for the end cell construction.  The difference between performance specifications and design specifications is well established.  *D&J Machinery, Inc.*, ASBCA No. 62019, 22-1 BCA ¶ 38,118 at 185,164.  Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 689 (1969).  Design specifications, in contrast, describe in precise detail the materials to be employed and the manner in which the work is to be performed.  The contractor has no discretion to deviate from the specifications, but is "required to follow them as one would a road map." *Id*.

The amount of discretion the specifications give to the contractor in execution of the contract is a question of contract interpretation, which is a matter of law for this Board to decide.  *Blake Constr. Co. v. United States*, 987 F.2d 743, 746 (1993) (citing *R.B. Wright Constr. Co. Through Rembrant, Inc. v. United States*, 919 F.2d 1569, 1571 (Fed.Cir.1990)).  Contract interpretation is a question of law that generally is amenable to summary judgment.  *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002).  However, the caveat to this general statement

relates to whether there is an ambiguity that requires the weighing of extrinsic evidence. *Dixie Constr. Co.*, ASBCA No. 56880, 10-1 BCA ¶ 34,422 at 169,918.

L.S. Black previously acknowledged that the specifications at issue here were performance specifications rather than design specifications. In its July 24, 2019, REA, L.S. Black asserted that the government's alleged delay in approving its thermal control plan violated the duty of good faith and fair dealing. In that letter, L.S. Black acknowledged that the "contract contained performance specifications that set forth an objective but did not describe the means and methods in which the work is to be performed." (SOF ¶ 51) L.S. Black went on to argue that the government's rejection of its thermal control plan submittals on the basis of the contractor's means and methods, when a specific method is not required by the contract, was a breach of the covenant of good faith and fair dealing. *Id.*

L.S. Black now asserts that the contract plainly required it to construct the end cell during the winter season (app. resp. at 16). We disagree. The contract did not expressly require the contractor to schedule its operations during the winter. Instead, FAR 52.236-4 stated that the contractor "has the responsibility to schedule its operations to take advantage of the most favorable river stages" and, in Clause 52.236-4061, the contract states that "[t]he Contractor will be required to conduct the work in such manner as to obstruct the channel as little as possible." (SOF ¶¶ 5, 6) The contract also included provisions for performing work during the navigation season, such as providing information on lock closures and requirements for a navigation plan and helper boats, indicating that construction during the navigation season also was an option for the contractor (SOF ¶ 6).

If the contract had plainly required the end cell to be constructed during the winter, as L.S. Black argues, then any contractor bidding on the contract would have been on notice of this requirement and should have known that it would need to adopt measures to control the temperature differential during mass concrete placement. L.S. Black cannot simultaneously argue that the contract required it to work during the winter and then claim ignorance of the technical requirements for doing so.

In addition, the contract provided significant discretion to the contractor to choose the means and methods for installing the end cell concrete. The contract specifications did not specify when the contractor would pour the concrete, a key factor in determining whether the proscribed temperatures could be maintained during the curing process. (SOF ¶¶ 5-7). Because the contract did not specify when the concrete for the end cell would be poured, the government had no way of knowing whether the contractor would utilize a thermal break or not. Although the contract contained requirements for the composition, aggregate size, and compressive strength of the mass concrete, it did not specify a particular concrete mix, a key factor in determining whether the proscribed temperatures could be maintained during the

curing process (SOF ¶10). Indeed, the contract expressly placed the responsibility on the contractor to choose a concrete mix that would be "proportioned to reduce or control the heat of hydration and the resulting temperature rise to avoid damaging the concrete through excessive temperatures and temperature differences." (SOF ¶ 11).

As the record demonstrates, there are other methods to control the temperature differential, including pouring the concrete during a different (warmer) time of year or by lowering the concrete temperature using external means. Indeed, L.S. Black's subcontractor, Braun Intertec, discussed other methods in its November 6, 2018 letter, including lowering the concrete temperature and insulating the interior face of the sheet pile (SOF ¶ 18).

L.S. Black further argues that, unlike traditional means and methods, which generally pertain to how a particular task is accomplished, a thermal break becomes a permanent aspect of the construction of the end cell. Thus, the requirement to include a thermal break should have been included within the design specifications of the project (app. mot. at 15, 18).

We disagree. The fact that L.S. Black chose to use a thermal break, which then became part of the structure does not change the nature of the original specification. For example, when constructing a concrete retaining wall, contractors have a wide choice of means and methods and could choose whether to use steel-reinforcements or interlocking pre-cast concrete blocks. Each of these methods may include elements that become part of the permanent structure, but that fact does not shed light on whether the specific elements of the concrete wall were dictated by design specifications or chosen by the contractor to meet performance specifications. Here, the thermal break only became a permanent part of the project when L.S. Black elected to use that method to control the temperature differential when curing the concrete in the end cell.

We conclude that the decision whether to install a thermal break was part of the contractor's choice of means and methods and that the specifications challenged by L.S. Black are performance specifications, not design specifications. Therefore, L.S. Black's defective specifications cause of action must fail.

## B. Alleged Delays in Approving the Thermal Control Plan

L.S. Black contends that the government repeatedly rejected L.S. Black's thermal control plan without giving any reason other than saying that it was incomplete and that it failed to meet the contract's specifications for maximum temperature differential and that, as a consequence, it is entitled to an extension of the contract (app. mot. at 9-10 at SUMF 32).

17

To establish entitlement to an extension based on excusable delay, a contractor must show that the delay resulted from "unforeseeable causes beyond the control and without the fault or negligence of the Contractor," and the unforeseeable cause must delay the overall contract completion; *i.e.*, it must affect the critical path of performance. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000) (quoting FAR 52.249-10(b)(1)). Similarly, where both parties contribute to the delay, "neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." *See Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed. Cir. 1982) (quoting *Coath & Goss, Inc.*, 101 Ct. Cl. 702, 714-15 (1944)).

The undisputed factual timeline of L.S. Black's thermal control plan submittals demonstrates that the government conducted its review and approval within the timeframe set forth in the contract. The contract allowed the government 30 days to review each submittal (SOF ¶ 9). As the timeline establishes, the government responded to each submittal in a timely fashion, usually within one week of the submittal (SOF ¶¶ 23-33). The fact that L.S. Black needed multiple submittals speaks more to the incomplete nature of its submittals than it does to any delays on the part of the government. Indeed, as L.S. Black's subcontractor acknowledged, the first submittal was not a thermal control plan, but rather a submittal to provide notice of L.S. Black's approach and intention to add a pre-cast concrete thermal break to the cell design (SOF ¶ 26). Ultimately, the entire review process for the thermal control plan was completed in mid-February, approximately two months from L.S. Black's initial submittal of its thermal control approach (SOF ¶¶ 23-33).

In its opposition to the government motion for summary judgment, L.S. Black merely asserts that "whether the government delayed its review [of the thermal control plan] is a material fact the resolution of which will play a material role in determining the outcome of this case." Whether the government unreasonably delayed its review of the thermal control plan is not a fact *per se*, but rather involves the application of law to specific facts regarding when particular events occurred. Merely disagreeing with the government's position is not sufficient to create a dispute of material fact. *Betance Enterprises, Inc.*, ASBCA No. 63076 *et al.*, 23-1 BCA ¶ 38,273 at 185,835 (quoting *Aviation Enters., Inc.*, ASBCA No. 34505, 89-3 BCA ¶ 21,995 at 110,600 ("appellant's mere disagreement is insufficient to create a genuine issue of material fact")).

L.S. Black's most salient objection to the government's facts is its contention, purportedly to add context, that the government's specifications assumed that the work would be performed in the summer, and that the final approved thermal control plan included pre-cast concrete panels that were not included in the government's original "design specification" (app. resp. at 6). This objection is premised on appellant's argument that the government's specifications for the end cell were design

specifications and that the specifications were defective. As we have found, the government's specifications for the end cell concrete were *performance* specifications, not *design* specifications, and the appellant's decision to include pre-cast concrete panels reflected its choice of means and methods. Moreover, this contention does not in any way contradict the evidence presented by the government regarding the speed with which it approved appellant's submittals.

The uncontested facts discussed a few paragraphs above do not support appellant's claim that the government unreasonably delayed its review of the thermal control plan, but, instead, support a finding that the government review was accomplished within a reasonable time. L.S. Black made six submittals and the government responded to each submittal within seven days or less (FOF 23 - 33). Moreover, in every instance, the government provided a facially reasonable basis for rejecting the submittal and L.S. Black has not presented a single piece of evidence challenging those bases. To the contrary, L.S. Black's own internal discussions reflected it and its subcontractor's concession that its submissions were deficient (FOF 26). Under these circumstances, there are no disputed material facts supporting L.S. Black's allegation that the government unreasonably delayed its review of the thermal control plan. We hold that appellant has failed to meet its burden of demonstrating that the government unreasonably delayed its review of the thermal control plan and that the government is entitled to summary judgment.

## C. Armor Plate

The government maintains that it is entitled to summary judgment regarding L.S. Black's allegations that the government caused the delays in L.S. Black's installation of the armor plate and sheet piling (gov't mot. at 19-22). Specifically, the government maintains that the delays were appellant's responsibility and that they were concurrent with any alleged delays caused by the government.

For its part, L.S. Black maintains that there are genuine issues of material fact concerning whether the government directed changes and delayed the project when it refused to suspend installation of the armor plate until river levels receded. Specifically, L.S. Black points to disagreements concerning whether unusually high water levels prevented the installation of the armor plate for several months and whether the armor plate would have functioned at such high water levels or even been necessary. (App. resp. at 19-20) L.S. Black contended in its July 18, 2019 letter to the government that the armor plating would not have functioned to protect the end cell at such high water levels, because any errant river traffic would have impacted the end cell above the armor plating (SOF ¶ 46).

It is undisputed that there was high water on the Mississippi River in the Spring and Summer of 2019 and that L.S. Black did not substantially complete the work until

September 2019 (SOF ¶¶ 36, 47-50). L.S. Black does not dispute that its installation of sheet piling and armor plate – both of which were on the critical path – were delayed. Instead, L.S. Black argues that it incurred compensable excess costs when the government's delay of the thermal control plan pushed L.S. Black into installing the sheet piling and armor plate under conditions of high water levels (app. br. at 2).

The undisputed factual timeline demonstrates that the delays associated with the installation of the sheet piling and armor plate were concurrent with the alleged delays associated with the thermal control plan. Specifically, the delays in the approval of the thermal control plan extended from December 2018 until February 2019 (SOF¶¶ 23-33), while the delivery of the steel for the armor plate and sheet pile installation was delayed from February until early March 2019. As L.S. Black's subcontractor acknowledged, the delay in the steel delivery forced the subcontractor to re-sequence its work around high water levels at the project site as a direct result of the delayed armor plate delivery (SOF ¶ 46). Therefore, even if the government were responsible for delays associated with the thermal control plan, which we previously found it was not, L.S. Black was responsible for the concurrent delays associated with the sheet piling and armor plate.

The record demonstrates that the installation of the metal sheet piling and the armor plate were on the critical path and that both were scheduled to be installed prior to any construction work related to the mass concrete (SOF ¶¶ 38, 42). As L.S. Black's schedule updates demonstrate, the armor plate work was independent of the mass concrete work and thermal control plan. Specifically, L.S. Black's January 30, 2019 schedule called for the installation of the armor plate before the final pour of mass concrete (SOF ¶ 38), whereas subsequent schedules moved the armor plate installation to after the final pour of mass concrete (SOF ¶ 45). This demonstrates that L.S. Black could have installed the armor plate at any time after the metal sheet piling was complete, which was scheduled for January 24, 2019. However, the armor plate was not on site when it was scheduled to be installed and it was not shipped to the site until early March (SOF ¶ 44). Therefore, even if the Government did delay the thermal control plan – which it did not – L.S. Black was responsible for a concurrent delay and would have needed to work during the high water season because of the delay in obtaining the armor plate from its supplier.

Although high water began impacting the site in mid-March (SOF ¶ 36), L.S. Black did not complete installation of the armor plate until September 11, 2019 (SOF ¶ 50). Therefore, we find that the issue of whether the armor plate would have functioned as intended at high water levels is not material, because we find that L.S. Black was responsible for the delay in the armor plate installation.

20

### III. Count II – Differing Site Conditions

In Count II of its amended complaint, L.S. Black contends that the historical Mississippi water tables incorporated into the contract bound the government regarding the water levels that L.S. Black would encounter and that water levels it encountered constituted a Type I differing site condition (am. compl. at 20). L.S. Black further argues that the disclaimer language contained in the historical water tables is insufficient to inoculate the government against liability for site conditions outside of the historical water tables (am. compl. at 21).

In order to establish a Type I differing site condition, a contractor must prove all four of the following elements: (1) that a reasonable contractor would interpret the contract documents as making a representation of the site conditions; (2) the actual site conditions were not reasonably foreseeable such that the contractor reasonably relied on the representations; (3) the contractor did in fact rely on the contract representation; and (4) the conditions differed materially from those represented and the contractor suffered damages as a result. *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348-49 (Fed. Cir. 2008).

The first factor is an issue of contract interpretation. *Id.* at 1349. "A contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what the conditions would be." *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1363 (Fed. Cir. 2002). Here, the fact that the government provided extensive elevation hydrographs as part of its contract documents does not automatically render the hydrographs a representation of site conditions.

As the contract expressly states with respect to river conditions:

> Actual water levels may vary from those indicated on the historic hydrographs. The contractor has the responsibility to schedule its operations to take advantage the most favorable river stages.

(SOF ¶ 5) As the contract indicates, the government provided the hydrographs to assist the contractor in determining the most favorable river stages for its work. The contract, and the hydrographs themselves, say nothing about the precise conditions the contractor would encounter during performance. Unlike soil conditions, which are reasonably static, river water levels constantly change due to weather conditions. This is unlike the cases in which the government provides soil samples to represent soil conditions at a construction site. *See e.g.*, *Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696, 715 (2007) (government-provided data regarding subsurface conditions reasonably was considered to be part of the contract).

21

Moreover, although the contract here does not contain a specific disclaimer stating that the hydrographs are not part of the contract, the contract's language is sufficient to put the contractor on notice that the hydrographs are not meant to represent actual site conditions. Indeed, the contract expressly states that the contractor is responsible for whatever conclusions it draws from the data provided:

> Data and information furnished or referred to below is for the Contractor's information. The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor . . . .

(SOF ¶ 5) We conclude that the hydrographs in the contract do not represent the site conditions the contractor should expect to encounter.

With respect to the second factor of reasonable foreseeability, it is well established that weather, no matter how severe, is not a differing site condition pursuant to FAR Clause 52.236-2 Differing Site Conditions. *See Titan Pacific Construction Corp.*, ASBCA No. 24148 *et al.*, 87-1 BCA ¶ 19,626 at 99,355 (holding that severe weather was not a differing site condition, even though contract provided historical weather data); *also PBS&J Constructors, Inc.*, ASBCA Nos. 57814, 57964, 14-1 BCA ¶ 35,680 at 174,653 (holding that the differing site conditions clause protects a contractor from undisclosed or unknown site conditions that predate the contract, not something occurring thereafter). Indeed, the differing site conditions clause applies only to conditions which existed at the time of contracting; weather conditions which occur during the contract period are not covered by the differing site conditions clause. *Dennis T. Hardy Electric, Inc.*, ASBCA No. 47770, 97-1 BCA ¶ 28,840 at 143,871.

Here, the high water in the Mississippi River was a severe weather condition that falls under the default clause at FAR Clause 52.249-10 Default (Fixed-Price Construction). *Luhr Bros., Inc.*, ASBCA No. 52887, 01-2 BCA ¶ 31,443 at 155,292 (citing *Turnkey Enterprises*, 597 F.2d 750 (Ct. Cl. 1979), *Apache Constr. Co.*, ASBCA No. 36895, 90-2 BCA ¶ 22,718, and *H.B. Mac, Inc.*, ASBCA No. 32455, 86-3 BCA ¶ 19,145). Consistent with the Default clause, the government offered appellant additional time due to the unusually severe weather, but did not offer additional monetary compensation (SOF ¶ 35). A contractor usually is only entitled to additional time for unusually severe weather, but the government has no legal responsibility for the additional costs incurred. *See Southland Constr.*, ASBCA No. 32677, 87-1 BCA ¶ 19,672 at 99,588 (holding that contractor bears risk of unusually severe weather).

Finally, with respect to the third factor, L.S. Black has not demonstrated that it reasonably relied upon the historic hydrographs for water levels in March 2019. Because the original contract completion date was February 28, 2019 (SOF ¶ 3),

22

L.S. Black cannot establish that it reasonably relied upon hydrographs for a period of time *after* the original contract completion date. (Gov't br. at 28) It was only after the weather delayed the work that the March 2019 period of time became relevant.

For these reasons, we deny L.S. Black's differing site conditions claim set forth in Count II of its amended complaint.

## IV. Count III – Duty of Good Faith and Fair Dealing

In Count III of its amended complaint, L.S. Black alleges that the government breached its duty of good faith and fair dealing by repeatedly rejecting L.S. Black's thermal control plan submissions "on the basis of comments from the St. Louis District, which is not party to the Contract as either the immediate procurement team or the contractor, on the means and methods proposed" by L.S. Black (am. compl. ¶ 100). According to L.S. Black, this hindered its ability to perform work in the non-navigational period and caused it to incur substantially increased costs (am. compl. ¶ 101).

In its subsequent motion, L.S. Black appears to have abandoned the argument set forth in Count III of its amended complaint. In its partial motion for summary judgment, L.S. Black contends that the government breached the duty of good faith and fair dealing by knowingly providing defective specifications and withholding superior knowledge (app. mot. at 21-23). This argument merely repackages L.S. Black's previous arguments concerning defective specifications, delay, and superior knowledge, and presents them as breaches of the duty of good faith and fair dealing. In sum, L.S. Black has raised no new substantive arguments in contending that the government breached its duty of good faith and fair dealing, and we therefore grant summary judgment as to Count III of L.S. Black's amended complaint.[4]

## V. Count IV – Superior Knowledge

In Count IV of its amended complaint, L.S. Black alleges that the government possessed superior knowledge regarding the design and construction of the upper guidewall extension and end cell at Lock and Dam 3 (am. compl. ¶ 106-07). Specifically, L.S. Black argues that the government should have provided information about the work at Lock and Dam 3 to L.S. Black and its expectation that the work would be performed during the summer months. L.S. Black further contends that,

---

[4] We note that even had L.S. Black not abandoned the theory advanced in its amended complaint, the result would have been the same. The government's consulting different branches of the Corps of Engineers is hardly the stuff of a breach of this contractual duty. *See, e.g., Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,539 (setting forth elements of the duty).

once L.S. Black submitted its project schedule showing that the work would be done in the winter, the government should have informed L.S. Black that the work could not be completed without the inclusion of a thermal break (app. br. at 21).

The doctrine of superior knowledge is based upon the premise that, where the government has knowledge of vital information that will affect a contractor's performance, the government is obligated to share that information. *Helene Curtis Industries, Inc. v. United States*, 312 F.2d 774, 778 (Ct. Cl. 1963). In order to recover on a claim based on superior knowledge, the contractor must show: (1) the contractor undertook performance without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of the vital information and no reason to obtain such information; (3) the contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. *Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994), *aff'd on other grounds*, 516 U.S. 417 (1996).

L.S. Black's contentions regarding superior knowledge are unavailing. As a threshold matter, because we have concluded that the contract specifications are performance specifications and not design specifications, the doctrine of superior knowledge does not apply. A cause of action for failure to disclose superior knowledge is grounded in the government's warranty of its contract specifications. *Am. Ordnance LLC*, ASBCA No. 54718, 10-1 BCA ¶ 34,386 at 169,753 (contractor must show, *inter alia*, that the contract specification supplied misled the contractor or did not put it on notice to inquire); *Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,527 (element of superior knowledge claim is whether contract specification provided either misled the contractor or did not put it on notice to inquire). Because no warranty attaches to the government's performance specifications, it has no duty to disclose superior knowledge.

The duty to disclose does not cover information regarding the methods used by prior contractors when the contractor is responsible for determining the method of performance. *Intercontinental Mfg. Co. v. United States*, 4 Cl. Ct. 591, 599 (1984) ("[I]t is incumbent upon the aggrieved contractor to explain why, in this procurement, it would have been beyond its properly expected skills and abilities to have foreseen the manufacturing problems that were encountered and the solutions they demanded.") Here, L.S. Black should have been aware of the potential need for a thermal break if the concrete was poured during the winter season, and the government's failure to disclose how the end cell was constructed at a different lock and dam was not material. Indeed, as the court stated in *Intercontinental*: "The doctrine of superior knowledge is not aimed at compelling disclosure whenever the Government knows more than the contractor *might*, its aim, instead, is to address those situations where the Government knows more than the contractor *should*." *Id.* at 600 (emphasis in original).

24

Moreover, our appellate court has similarly held that the doctrine of superior knowledge "only applies if 'the government was aware the contractor had no knowledge of and had no reason to obtain such information' and 'any contract specification supplied misled the contractor or did not put it on notice to inquire.'" *Scott Timber Co. v. United States*, 692 F.3d 1365, 1373 (Fed. Cir. 2012). Here, the government had no way of analyzing, in advance, whether a thermal break would be necessary. For example, because the contractor could choose when, and how, to perform the work, the government could not have known in advance whether the concrete would be poured in the summer or winter season. *FSEC, Inc.*, ASBCA No. 49509, 99-2 BCA ¶ 30,512 at 150,667 (contractor must demonstrate that government was aware that contractor lacked vital knowledge).

This appeal is unlike *Helene Curtis Industries, Inc. v. United States*, 312 F.2d 774 (Ct. Cl. 1963), a case relied upon by L.S. Black. *Helene Curtis* holds that the government may be liable for an end-product specification "if it breaches an independent duty to reveal data or if the end-product specification embodies a material misrepresentation misleading the contractor." *Id*. at 778. In this appeal, there is no evidence of a material misrepresentation. At most, L.S. Black contends that the Corps failed to tell L.S. Black about how the end cell was constructed at Lock and Dam 3. This information – specifically that the Lock and Dam 3 end cell was constructed during the summer months without the use of a thermal break – is not a material fact. The fact that an end cell was constructed in the summer without a thermal break says nothing about whether a thermal break is necessary at any other point in time, or even whether a thermal break is the most appropriate method for controlling temperature differentials during the mass concrete curing process.

For these reasons, appellant's superior knowledge claim fails.

<u>CONCLUSION</u>

For the forgoing reasons, we grant the government's motion for summary judgment and deny appellant's cross-motion for partial summary judgment. Accordingly, we deny the appeal.

Dated: August 21, 2023

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

25

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62402, Appeal of L.S. Black-Loeffel Civil Constructors JV, rendered in conformance with the Board's Charter.

Dated:  August 23, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

26